[Crim. No. 9452. Third Dist. Mar. 15, 1978.]

In re WILLIAM STEVEN LEE et al. on Habeas Corpus.

## COUNSEL

Robert N. Chargin, Public Defender, and Jack Rosenberg, Deputy Public Defender, for Petitioners.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Marjory Winston Parker, Gregory W. Baugher and John R. Duree, Jr., Deputy Attorneys General, for Respondent.

## OPINION

**FRIEDMAN, J.**\*—In this consolidated decision we act upon two habeas corpus petitions transferred here for decision by the state Supreme Court.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

In 1976 both petitioners were charged with crime in San Joaquin County, Lee with aggravated assaults and Froberg with robbery. Both were found not guilty by reason of insanity and committed to Atascadero State Hospital, which is located in San Luis Obispo County. On August 1, 1977, both applied for release, alleging restoration to sanity. The San Joaquin County Superior Court ordered petitioners returned to that county, fixed a hearing date and ordered their interim confinement in the county jail. The hearing did not take place as scheduled but was continued. On September 22, 1977, both petitioners were still held in jail. Their habeas corpus petitions challenged the validity of their jail confinement pending the restoration-to-sanity proceedings.

■ We have been informed that petitioners are no longer in jail and are receiving care through psychiatric facilities. At oral argument we ascertained that the restoration-to-sanity hearings had not yet taken place. The San Joaquin County procedure of jailing these applicants may be duplicated in other counties. The case poses an issue of broad public interest which is likely to recur. Therefore we exercise our inherent discretion to resolve the issue even though recent events would normally make it moot. (See *In re William M.* (1970) 3 Cal.3d 16, 23-25 [89 Cal.Rptr. 33, 473 P.2d 737] and cases cited.)

■ Pointing to their acquittal of crime, petitioners invoke constitutional protection against jail confinement, however temporary. We have concluded that San Joaquin County's practice of jailing these applicants stems from a misinterpretation of state law and cannot stand.

Penal Code sections 1026 and 1026a and Welfare and Institutions Code section 7375 provide the prime regulations on the subject. These statutes are fairly complex; for our purpose a partial description and summary are enough. California law does not mandate institutionalization of a defendant who has been found not guilty by reason of insanity. ■ Penal Code section 1026 calls for release proceedings if the defendant "appears" to have recovered his sanity, institutionalization if he does not. It declares: "If . . . it shall appear to the court that the defendant has fully recovered his sanity such defendant shall be remanded to the custody of the sheriff until his sanity shall have been finally determined in the manner prescribed by law."

As judicially interpreted, this clause requires a preliminary judicial finding on the score of recovery; an affirmative finding is followed by proceedings of involuntary civil commitment under the Lanterman-

Petris-Short Act (LPS; Welf. & Inst. Code, § 5000 et seq.; *People* v. *Kelly* (1973) 10 Cal.3d 565, 577-578, fn. 18 [111 Cal.Rptr. 171, 516 P.2d 875]; *In re Slayback* (1930) 209 Cal. 480, 484 [288 P. 769].) According to LPS, the subject may be detained for 72 hours in a treatment and evaluation facility approved by the State Department of Health. Under some circumstances he may be detained for an additional 14 days of intensive treatment; may be detained for an additional 90 days only if he has threatened or inflicted physical harm on another. (Welf. & Inst. Code, §§ 5150, 5200, 5250, 5300; see *Thorn* v. *Superior Court* (1970) 1 Cal.3d 666, 668-671 [83 Cal.Rptr. 600, 464 P.2d 56].)

Arguably, the direction in section 1026 for remand "to the custody of the sheriff" means that the person be held in jail pending the release proceeding. The statutory incorporation of LPS procedures signifies otherwise. LPS does not permit the subject's jailing during the evaluation and treatment periods; rather he must be placed in a "facility designated by the county and approved by the State Department of Health as a facility for 72-hour treatment and evaluation." (Welf. & Inst. Code, § 5150.) The interweaving of LPS with Penal Code section 1026 signifies that after the court's preliminary finding of recovery the sheriff must take the person to the same kind of facility as a mentally disordered person facing involuntary civil commitment.

■ At this point we turn to the obverse situation—the defendant acquitted by reason of insanity who does not "appear" to have recovered. Section 1026 permits the defendant's institutionalization without further hearing.

According to former law, institutionalization took the form of a state hospital commitment. Section 1026 was amended in 1974 and 1975 to supply the court with the additional alternatives of commitment to a local psychiatric facility or to out-patient treatment. (Stats. 1974, ch. 1423; Stats. 1975, ch. 1274; see 6 Pacific L.J. 484-507 (1975); 6 Pacific L.J. 273-281 (1975); 7 Pacific L.J. 405-410 (1976).) ■ No precommitment hearing is constitutionally necessary; Penal Code section 1026a permits the individual to apply for release on the ground of restored sanity after a minimum of 90 days under commitment; the application is made to the committing court which is to hold a hearing. The availability of a postcommitment release hearing after 90 days satisfies due process demands. (*In re Franklin* (1972) 7 Cal.3d 126, 136-139, 143 [101 Cal.Rptr. 553, 496 P.2d 465].) ■ An applicant who requests it is entitled to a jury trial. (*Id.,* at pp. 148-149.) ■ The test for the determination of

release is whether the person has improved to the point where he is no longer a danger to the health and safety of himself and others. (*Id.,* at p. 145.)

■ Welfare and Institutions Code section 7375, subdivision (b), calls for release after proceedings under Penal Code section 1026a. The proceeding usually entails the applicant's presence. (*Kravitz* v. *State of California* (1970) 8 Cal.App.3d 301, 306 [87 Cal.Rptr. 352]; see also, *In re Smith* (1976) 57 Cal.App.3d 336 [129 Cal.Rptr. 268].) Prior to the 1974 and 1975 amendments, an application for release could be addressed to the superior court of the county in which the patient was confined, that is, the county in which the state hospital was located. (See Witkin, Cal. Crim. Procedure (1963) § 507.) In that condition of the law the patient could be transported between the hospital and the county seat; alternatively, a court hearing could be held at the hospital. (See *In re Jones* (1968) 260 Cal.App.2d 906, 913 [68 Cal.Rptr. 32].) The 1974 and 1975 amendments fixed exclusive venue in the committing court. The present problem has its genesis in the failure of the 1974 and 1975 amendments to supply any direction for institutional custody pending the hearing.

No custody arrangement is necessary for an applicant who has been admitted to outpatient status or who is on parole from the institution. (See Welf. & Inst. Code, § 7375.) That person need only walk into the courtroom under his own power. Nor is alteration in custody necessary for the patient committed to a local psychiatric facility. That sort of patient need only be escorted to the courtroom. Interim custody is necessary only when the applicant is an in-patient in a state hospital or psychiatric facility in another county. The present version of section 1026a exhibits no awareness of that necessity. We must construe the statute to ascertain the Legislature's unexpressed intent.

■ The 1974 and 1975 amendments of sections 1026 and 1026a were accompanied by changes in companion statutes shaping the criminal law's treatment of mentally disordered persons. In general, these amendments exhibit a legislative design to absorb LPS procedures into the Penal Code. If a person committed under Penal Code section 1026 needs in-patient treatment pending a determination of his outpatient status, LPS procedures apply. (Welf. & Inst. Code, § 7375, subd. (f)(5) formerly § 7375, subd. (d)(5).) If a "presently incompetent" defendant is institutionalized before trial and there is no substantial likelihood of his recovery, he must be returned to the criminal court for release or for involuntary commitment under LPS procedures. (Pen. Code, § 1370,

subd. (b)(1).) If the criminal charge is dismissed while he is still institutionalized, he is subject to LPS involuntary commitment proceedings. (Pen. Code, § 1370, subds. (a) and (e).) If he needs treatment pending a determination of his outpatient status, LPS procedures govern. (Pen. Code, §§ 1370.3, subd. (e), 1374, subd. (f).) A jail inmate who exhibits mental disorder must be transferred to a 72-hour treatment and evaluation facility (i.e., he must be taken from jail) at which point LPS provisions apply. (Pen. Code, § 4011.6.)

■ All the 1974 and 1975 amendments dealt with the same general subject and should be harmonized if possible. (*County of Placer* v. *Aetna Cas. etc. Co.* (1958) 50 Cal.2d 182, 188-189 [323 P.2d 753].) Although section 1026a omits an express direction for custody pending the release hearing of a state hospital patient, resort to LPS procedures—including the patient's transfer to an approved treatment and evaluation facility —is consistent with the legislative design exhibited by the companion statutes. A precommitment release hearing under section 1026 and a postcommitment release hearing under section 1026a are directed at the same objective—both seek to determine whether the person may be safely released. In express terms, section 1026 directs a precommitment hearing "in the manner prescribed by law." Section 1026a calls for a hearing but does not prescribe the manner. No other direction can be implied than one for hearing "in the manner prescribed by law." Just as section 1026 sub silentio incorporates the LPS conditions into the precommitment hearings (*People* v. *Kelly, supra,* 10 Cal.3d 565), so does section 1026a incorporate these conditions into the post-commitment hearing. In both cases, the subject's temporary place of detention is a treatment and evaluation facility approved by the State Department of Health. (Welf. & Inst. Code, § 5150.)

The infusion of LPS detention procedures into Penal Code determinations creates minor procedural uncertainties and occasions some improvisation. The procedure for involuntary civil commitment was "written into" section 1026 at a time when the civil commitment function rested with the superior court. (See *In re Slayback, supra,* 209 Cal. at p. 484.) Civil commitment of mentally disordered persons is no longer a judicial function. (Welf. & Inst. Code, § 5002.) Under LPS determinations are not made by the court but by the professional staff of the treatment and evaluation facility. (Welf. & Inst. Code, §§ 5150-5151, 5250-5251.)

It is clear, nevertheless, that postcommitment release determinations under section 1026a are a judicial function. The applicant is entitled to a

jury trial. (*In re Franklin, supra,* 7 Cal.3d at pp. 148-149.) Section 1026a declares that "if the finding of the court be adverse" to release, the applicant must wait a year before reapplying. Thus, section 1026a contemplates an open-court hearing. Whether the 72-hour and 14-day deadlines of LPS govern is not at all clear. Busy trial courts would find difficulty in holding hearings within the 72 hours initially alloted by LPS; most could manage a hearing within the additional 14 days prescribed by LPS. In a county such as San Joaquin, where approved treatment facilities are situated, transportation between the facility and the superior court creates only a minor problem. The transportation problem is magnified in a rural county without its own LPS evaluation facility. Counties of the latter sort may need the help of clarifying statutes.

We conclude that petitioners' commitment to the San Joaquin County jail pending hearing of their release applications was invalid. The orders to show cause have served their purpose. They are discharged and the writs of habeas corpus are denied.

Reynoso, J., concurred.

**PUGLIA, P. J.**—I respectfully dissent. At the fulcrum of the court's opinion is its determination that procedures for involuntary civil commitment under the Lanterman-Petris-Short Act (LPS; Welf. & Inst. Code, §§ 5000-5404.1) have by some kind of osmosis been assimilated into the Penal Code procedures governing the discharge of those who have been committed as criminally insane (Pen. Code, § 1026a). Proceeding from this premise, the court concludes that, pending termination of restoration-of-sanity proceedings (Pen. Code, § 1026a), the petitioners were entitled to be held in a local treatment and evaluation facility (Welf. & Inst. Code, §§ 5150, 5206), and that their detention in the county jail was accordingly illegal. With this reasoning, I cannot agree.

On a plea of not guilty by reason of insanity, if the trier of fact finds that a defendant was insane at the time of commission of the crime, the trial court must commit the defendant for care and treatment unless it shall appear to the court that the defendant has fully recovered his sanity. In the latter event, the court shall remand the defendant to the custody of the sheriff "until his sanity shall have been finally determined

in the manner prescribed by law." (Pen. Code, § 1026.) The procedures to be followed in respect to a defendant who appears to have fully recovered his sanity are not spelled out in Penal Code section 1026; there is merely the direction to proceed "in the manner prescribed by law." Unless that phrase has reference to other provisions of law for commitment of the mentally ill it has no meaning at all; indeed it has been interpreted to refer to contemporaneously existing procedures for involuntary civil commitment of persons alleged to be mentally ill. (*In re Slayback* (1930) 209 Cal. 480, 484 [288 P. 769]; *People* v. *Kelly* (1973) 10 Cal.3d 565, 577-578, fn. 18 [111 Cal.Rptr. 171, 516 P.2d 875].) Therefore, one must necessarily look to LPS for legislative direction for precommitment sanity restoration determinations.

The same conclusion does not necessarily follow in respect to postcommitment sanity restoration determinations. They are governed by Penal Code section 1026a. Unlike section 1026, section 1026a provides detailed guidance for the manner in which postcommitment sanity restoration is to be determined. Under that section, the application for release from commitment is made to the committing court; either the defendant or the superintendent of the commitment facility may make the application; thereafter if at least 90 days have elapsed from the date of commitment, a hearing must be held; the court (or, if requested, the jury (*In re Franklin* (1972) 7 Cal.3d 126, 149 [101 Cal.Rptr. 553, 496 P.2d 465])) shall find whether defendant's sanity has been restored; the burden of so proving is upon the defendant; if the finding is adverse to the defendant, he may not file another application for release for yet another year. Penal Code section 1026a thus contemplates a plenary judicial hearing.

By contrast, LPS provides that sanity determinations will be made by the professional staff of the evaluation and treatment facility (Welf. & Inst. Code, §§ 5152, 5213); persons subjected to evaluation under LPS cannot be detained any longer than 72 hours (Welf. & Inst. Code, §§ 5151, 5213) but must be released, referred for further care and treatment on a voluntary basis or certified for intensive treatment. (Welf. & Inst. Code, §§ 5152, 5206.)[1] A person detained for 72 hours who is found by

---

[1] A conservatorship is another alternative in the case of an individual who is gravely disabled (Welf. & Inst. Code, § 5350), i.e., who by reason of mental disorder or chronic alcoholism is unable to provide for his personal needs for food, clothing or shelter or who has been found mentally incompetent under Penal Code section 1370 and against whom there is pending an accusatory pleading charging a felony involving death, great bodily harm or a serious threat to the physical well being of another person (Welf. & Inst. Code, § 5008, subd. (h)).

the professional staff of the evaluation and treatment facility to be dangerous to himself or others or gravely disabled and who rejects voluntary treatment may be detained for not more than 14 days for intensive treatment (Welf. & Inst. Code, § 5250); such a person must be released at the end of 14 days unless in the judgment of the professional staff he is imminently suicidal (Welf. & Inst. Code, § 5260) or after hearing is found by the court or jury to present an imminent threat of substantial physical harm to others. (Welf. & Inst. Code, § 5301). In the former case, the individual may be detained not more than 14 additional days (Welf. & Inst. Code, § 5264); in the latter case, an additional 90 days (Welf. & Inst. Code, § 5300).

It can be seen that under LPS, decisions relative to mental condition and commitment are almost entirely the province of professional staff; treatment which does not involve involuntary commitment is preferred; and the potential duration of involuntary confinement is exceedingly brief and strictly circumscribed. On the other hand, in proceedings under Penal Code section 1026a, decisions relative to mental condition and commitment are judicially determined; there are no alternatives to involuntary commitment or discharge; and the duration of potential commitment after the initial 90-day period is measured in increments of one year.

The reason for these differences was explained in *In re Franklin, supra,* 7 Cal.3d at page 138: "Although differing from the provisions applicable to ordinary civil commitment, the procedures for commitment and release of persons acquitted as insane are based upon a 'special' public interest. '[T]he finding by the jury that a defendant, because of his mental disease or defect, shall be held blameless for an act otherwise subject to criminal sanctions *puts such a defendant into an exceptional class.* The special interest which the public has acquired in the confinement and release of people in this exceptional class results from the fact that there has been a judicial determination that they have already endangered the public safety and their own as a result of their mental conditions as distinguished from people civilly committed because of only potential danger.' " (Original italics; fn. omitted.)

The provisions of LPS obviously were not enacted with reference to individuals who have already endangered the public safety by the commission of an act or acts which but for their mental condition would have subjected them to criminal liability. As with the square peg in the round hole, procedures under LPS and section 1026a are totally

incongruent. Indeed it is difficult to imagine two less complementary sets of procedures.[2]

Moreover, the requirement that LPS facilities be used to confine individuals pending Penal Code restoration of sanity hearings will work a hardship on smaller counties, some of which may not have such facilities within the county itself. (See Welf. & Inst. Code, § 5602.) In those counties, the logistics of arranging defendant's court appearances, especially in protracted proceedings, will impose additional burdens on law enforcement resources and personnel and further aggravate the unavoidable security risks entailed in moving dangerous persons while in custody.

The foregoing considerations lead me to the conclusion that the Legislature did not intend that the situation of these petitioners be governed by LPS. Therefore, a treatment and evaluation facility contemplated by LPS is not the required or proper place for their confinement pending proceedings to determine restoration of sanity.

Petitioners contend nonetheless that their confinement in county jail is unauthorized and illegal.

An inmate of the state hospital committed under Penal Code section 1026 is entitled to periodic judicial review of his continued confinement and has the right to be personally present at such proceedings. (See *In re Franklin, supra,* 7 Cal.3d at pp. 148-149.) Although there is no express statutory provision for return of a state hospital inmate to the county of commitment and confinement in county jail there pending restoration of sanity proceedings, the power to do so may be implied from section 1026a. Furthermore, subdivision 3 of Penal Code section 4000, providing for confinement in county jail "of persons committed for contempt, or upon civil process, or by other authority of law" is a sufficiently broad authorization to encompass the instant confinement so long as the conditions of confinement comport with the demands of due process.

[2]There is no anomaly in the fact that LPS has been assimilated into precommitment procedures under Penal Code section 1026. As previously stated, there is no inconsistency between LPS and section 1026 because the latter omits to provide any procedural guidance whatever for precommitment proceedings. Moreover, precommitment proceedings are not instituted unless the court first finds that defendant has fully recovered his sanity. Thus the likelihood that defendant is still affected with a mental condition constituting him a danger to society is greatly reduced. In contrast, one who seeks discharge from commitment under Penal Code section 1026a presumptively is still afflicted with a mental condition that renders him dangerous to society, and he has the burden in those proceedings of proving that his sanity has been restored.

" 'What is due process depends on the circumstances. It varies with subject matter and the necessities of the situation. [Citation.] Its content is a function of many variables, including the nature of the right affected, the degree of damage caused by the proscribed condition or activity, and the availability of prompt remedial measures.' " (*Thorn* v. *Superior Court* (1970) 1 Cal.3d 666, 673 [83 Cal.Rptr. 600, 464 P.2d 56].) Due process requires that the nature and duration of confinement bear some reasonable relationship to the purpose of that confinement. (*In re Davis* (1973) 8 Cal.3d 798, 801 [106 Cal.Rptr. 178, 505 P.2d 1018].)

In order to exercise their right to be present at a restoration-of-sanity hearing, petitioners must be brought to San Joaquin County and kept available there until the section 1026a proceedings conclude. Because petitioners belong to that special class of persons who have already endangered the public safety as a result of their mental conditions (*In re Franklin, supra,* 7 Cal.3d at p. 138), they must be securely confined while in San Joaquin County.

In the San Joaquin County jail, petitioners were segregated from the general criminal population; they received needed medication and medical attention; two psychiatrists familiar with petitioners' cases expressed the opinion that detention in county jail will not adversely affect their recovery.

Under the circumstances, I conclude that confinement of petitioners in the county jail is lawful and is not violative of due process standards nor has it subjected petitioners to cruel or unusual punishment. (Cf. *People* v. *Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373].)

Respondent's petition for a hearing by the Supreme Court was denied May 11, 1978.