Filed 10/10/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E068576 |
| v. | (Super.Ct.No. FSB07901) |
| MARC ANTHONY ENDSLEY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Lorenzo R. Balderrama, Judge. Reversed with directions.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

1

This is Marc Anthony Endsley's second appeal challenging the denial of his Penal Code section 1026.2 petition for conditional release from the state hospital. (See Pen. Code, § 1026.2 subds. (a)-(m), unlabeled statutory citations refer to this code.) Endsley was committed to the state hospital in 1997 after a jury found him not guilty of the first degree murder of his father by reason of insanity (NGI).

In his first appeal, he argued the trial court erred by summarily denying his petition without a hearing. (See *People v. Soiu* (2003) 106 Cal.App.4th 1191, 1198 (*Soiu*) [trial court may not deny § 1026.2 petitions for conditional release "without holding a hearing at which [the NGI petitioner] would be present"].) In *People v. Endsley* (2016) 248 Cal.App.4th 110 (*Endsley I*), we agreed he was entitled to a hearing and—interpreting section 1026.2, subdivision (*l*), which prohibits a trial court from ruling on an NGI's application for release without first reviewing the state hospital's recommendation on the appropriateness of release—held it was the duty of the trial court, not the NGI, to procure the recommendation. On remand, the trial court obtained the recommendation, held a hearing at which the state's experts testified against release, and again denied the petition.

Before issuing that ruling, the court denied Endsley's request for an independent expert to assist him in demonstrating he was ready for outpatient treatment. The court also denied Endsley's request to testify remotely by telephone to avoid being transferred from state hospital to jail before his hearing. To support his request to testify remotely, Endsley argued NGIs could not be housed in jail pending hearings on their petitions for

2

release from state hospital commitment under the holding of *In re Lee* (1978) 78 Cal.App.3d 753 (*Lee*).  Taking Endsley's objection to jail as a refusal to testify in person, the trial court denied his request to testify remotely and proceeded to rule on the petition.

In this appeal, Endsley challenges the denial of his two prehearing requests, arguing the trial court violated his constitutional rights to testify at his hearing and to the assistance of an independent medical expert.  Endsley argues the court erred by ruling on his request to testify remotely without first ensuring the selection of a confinement facility that could "continue [his] program of treatment," as required by section 1026.2, subdivisions (b) and (c).  He also argues the holding in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee*) that sexually violent predators (SVPs) have a due process right to the appointment of an independent expert to assist them in petitioning for conditional release from involuntary civil confinement should extend to NGIs seeking conditional release.  For the reasons explained below, we agree with both of Endsley's contentions. We will therefore reverse the denial of his petition and remand to the trial court with directions set out in part III, *post*.

I

**FACTUAL BACKGROUND**

Endsley was committed to the state hospital in 1997 and remained there until 2012, when the trial court granted his petition for conditional release and placed him on outpatient status in San Bernardino County's conditional release program (CONREP). However, less than a year later, the court recommitted Endsley to the state hospital based

3

on reports he was refusing to process his anger and aggression toward CONREP for restricting his access to violent video games.

As we recounted in *Endsley I*, the periodic progress reports after his recommitment reflected Endsley was making steady progress on his anger and aggression issues. (*Endsley I*, *supra*, 248 Cal.App.4th at p. 115.) By October 2014, his treatment team had formally referred him to CONREP. His evaluator concluded he was "ready for placement in [CONREP]" and could "hopeful[ly]" be released "in the relatively near future." (*Id.* at pp. 115-116.) A March 2015 progress report noted he was demonstrating "more insight and control over his thoughts than in the past." (*Id.* at p. 116.)

In May 2015, Endsley filed a petition for conditional release under section 1026.2 and alleged his sanity had been restored such that he would not pose a danger to himself or others if placed in outpatient treatment. The petition requested a hearing and the appointment of an independent medical expert. (*Endsley I*, *supra*, 248 Cal.App.4th at p. 116.) That same month, the trial court summarily denied the petition without stating its reasons. Endsley appealed, and the People responded that summary denial was proper because he failed to submit the state hospital medical director's recommendation on the appropriateness of relief along with his petition. (*Id.* at pp. 114-115.) The People's argument required us to interpret the meaning of section 1026.2, subdivision (*l*), which provides, "If the application for the release is [made by the NGI as opposed to the person in charge of treatment], no action on the application shall be taken by the court without first obtaining the written recommendation of the medical director of the state hospital or

4

other treatment facility or of the community program director where the person is on outpatient status."

In June 2016, we issued *Endsley I*, where we held that Endsley was entitled to a hearing on his petition and that section 1026.2, subdivision (*l*) requires the trial court, not the NGI, to obtain the medical director's recommendation. (*Endsley I*, *supra*, 248 Cal.App.4th at pp. 114-115.) Following remand, in September 2016, the trial court ordered the state hospital to submit a report containing its recommendation on Endsley's petition by October 26, 2016. In February 2017, with the report still outstanding, the trial court reissued its order, this time with a deadline of March 8, 2017. Sometime between March 10 and 17, the state hospital filed its report. Dr. Laguitan, a state hospital psychiatrist and the author of the report, concluded Endsley was not ready for conditional release to CONREP and recommended retaining and treating him.

At a hearing on March 17, 2017, Endsley raised the issue of an independent expert, stating, "I would strongly like to object to the lack . . . of . . . any independent evaluators at all being appointed to come and see me. I believe it's a violation of my due process rights as . . . the only reports the Court is operating under are those that are being prepared by the people who are directly opposed to my release, that is the hospital and CONREP. I think that's biased." The court noted the objection and confirmed with Endsley that he would be appearing at his hearing telephonically, from the state hospital. At that point, the prosecutor objected to Endsley's testifying by any means other than in

5

person. The court noted the prosecutor's objection and deferred ruling until Endsley decided whether or not he wished to testify.

The hearing began on May 8, 2017 and lasted three days. Endsley's counsel moved six reports into evidence—four from the state hospital and two from CONREP. Endsley had been diagnosed with recurrent Major Depressive Disorder and an "Other Specified" personality disorder with schizoid, narcissistic, and avoidant features. Although the reports noted his Major Depressive Disorder was in remission and he had not acted out aggressively since 2010, they unanimously concluded Endsley was not ready for CONREP. According to the reports, he had not let go of his hostility towards CONREP for restricting his gaming privileges and he had been engaging in a pattern of responding angrily to rule or policy changes. He shut down after five minutes during his most recent interview with a CONREP evaluator (October 2016) and expressed on multiple occasions that he wanted the court to direct CONREP to accept him "without any rules related to video games." In April 2016, he wrote a letter to hospital administration in which he "voiced his unwillingness to comply with anticipated changes in unit policies" and used "hostile and threatening language directed towards staff."

The prosecutor presented the testimony of Dr. Laguitan from the state hospital and Dr. Smith, a psychologist working for CONREP. Both believed Endsley could not be safely treated in an outpatient facility because he did not respond well to authority, refused to discuss the anger he still harbored towards CONREP, and was not participating

6

in group therapy. They believed his refusal to process his anger in a therapeutic setting posed a danger that he would relapse to violence while in outpatient treatment.

At the end of the first day of the hearing, the court advised Endsley to discuss with his counsel whether he wanted to testify. The court said, "But we would need to transport you down here for that purpose, but you can think about it, at least over the next several days." Endsley responded, "I would very much like to testify in my case; however, pursuant to [*Lee*, *supra*, 78 Cal.App.3d at p. 753] . . . I cannot be housed in county jail." Endsley sought permission to testify remotely from the hospital's video conferencing facilities. The prosecutor objected, and the court deferred its ruling to allow defense counsel to research whether Endsley had a right to testify remotely.

Endsley's counsel reported the fruits of her legal research at the close of the prosecution's evidence. She said the authority she had found indicated Endsley was not entitled to testify remotely, but the trial court could exercise its discretion and allow him to do so. The prosecution again objected, arguing Endsley should have to "be present and feel the same process that everyone else who has to testify goes through." The court agreed, stating, "[I]n this kind of case, where Mr. Endsley is petitioning for conditional release . . . the Court itself would like to see him in person when he testifies." The court explained its practice was to allow remote testimony only when both parties agreed.

The court then asked "So, Mr. Endsley, did you want to come down to testify in your hearing or not?" and Endsley replied, "Well, your Honor, I'm going to be blunt here. I think at this point it's pretty obvious that this is a kangaroo court. Nothing I've

7

requested has been granted. I haven't been given my independent evaluators . . . [¶] . . . I can testify if I can do it over the phone or via [video]. But no point in sitting in jail for four months just so I can do this case . . . and then just rot in jail for four months. I'm a mental patient." The court responded, "Well, given that Mr. Endsley has decided not to come down to testify, I will give my ruling, then." Based on what is described as "overwhelming evidence" from the state against conditional release, the court denied Endsley's request for an independent expert and then denied his petition.

## II

## DISCUSSION

NGIs are "persons who initially have been found to have committed a criminal act, but whose mental condition warrants a period of confinement for treatment in a state institution, in lieu of criminal punishment." (*In re Moye* (1978) 22 Cal.3d 457, 463.) An NGI's involuntary civil confinement is thus "for purposes of *treatment*, not punishment." (*Id.* at p. 466; see also *People v. Buttes* (1982) 134 Cal.App.3d 116, 122 [NGIs are "found not guilty of committing the crime and cannot be punished by incarceration in prison . . . [as] the insane defendant can never be sent to a prison"].)

Because their hospitalization is for treatment not punishment, there are two ways an NGI may be released from commitment—either upon expiration of "the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted" (§ 1026.5, subd. (a)(1)), or upon a finding their sanity has been "restored," meaning they "no longer [pose] a danger to the health and safety of others,

8

due to mental defect, disease, or disorder" (§ 1026.2, subd. (e)). For Endsley, restoration of sanity under section 1026.2 is the only route to release because the longest term of imprisonment for first degree murder is imprisonment for life. (§ 190, subd. (a).)

Obtaining restoration-of-sanity release under section 1026.2 is a two-step process initiated when either the NGI or the person in charge of their treatment petitions the court for release. (§ 1026.2, subd. (a).) First, the NGI must be approved for and successfully complete one year of outpatient treatment (or less if the community program director recommends release sooner). Then, the court must hold a trial to determine whether the NGI can safely be returned to the community or whether they still pose a danger to others based on their mental illness or disorder. (§ 1026.2, subd. (e).) Section 1026.2 therefore envisions two factfinding proceedings—a hearing on the defendant's petition for conditional release, commonly called the "outpatient placement hearing," and a restoration of sanity trial. (*Soiu*, *supra*, 106 Cal.App.4th at p. 1196.) An NGI denied outpatient placement may reapply for conditional release after one year. (§ 1026.2, subd. (j).) Likewise, an NGI who has successfully completed outpatient placement and is denied full release may reapply for full release after a year. (*Ibid.*) Here, Endsley filed his own petition for release, which remains in step one, the outpatient placement hearing.

A.  *Designation of Local Facility for Prehearing Confinement (Section 1026.2, Subdivisions (b) and (c))*

NGIs have the right to appear and testify at the outpatient placement hearing. (*Soiu*, *supra*, 106 Cal.App.4th at p. 1198; *People v. Tilbury* (1991) 54 Cal.3d 56, 69 [those petitioning for conditional release under § 1026.2 are entitled to "the substantial

procedural safeguards associated with trials, including, among other things, the right to counsel, to a detached and neutral judicial officer, to present evidence, and to cross-examine adverse witnesses"].) To facilitate the appearance of an NGI who is being treated outside the county of the trial court, subdivisions (b) and (c) of section 1026.2 establish mandatory procedures for local, interim confinement.

As we explained in *Endsley I*, section 1026.2, subdivision (b) requires the community program director, with the help of the state hospital, to select a confinement facility capable of continuing the NGI's treatment while he or she awaits and attends the outpatient placement hearing. (*Endsley I*, *supra*, 248 Cal.App.4th at p. 117, citing § 1026.2, subd. (b).) Section 1026.2, subdivision (b) says: "Pending the hearing, the medical director or person in charge of the facility in which the person is confined shall prepare a summary of the person's programs of treatment and shall forward the summary to the community program director or a designee and to the court. The community program director or a designee shall review the summary and shall designate a facility within a reasonable distance from the court in which the person may be detained pending the hearing on the application for release. The facility so designated shall continue the program of treatment, shall provide adequate security, and shall, to the greatest extent possible, minimize interference with the person's program of treatment." Section 1026.2, subdivision (c) prohibits the court from detaining an NGI in jail *unless* the jail can continue their program of treatment and ensure the safety of the NGI as well as the other inmates. Finally, if during the NGI's local confinement the court receives evidence the

10

treatment facility or jail is failing to meet these requirements, "the court shall order the person transferred to an appropriate facility [and] make any other appropriate order, including continuance of the proceedings." (§ 1026.2, subd. (c).)[1]

The pre-hearing confinement provisions in section 1026.2, subdivisions (b) and (c) were enacted in response to *Lee*, a 1978 decision in which the court held that NGIs seeking release from state hospital commitment cannot be confined in jail pending a hearing on their petitions but instead must be placed in a local treatment facility approved for the involuntary treatment of mental illness under the Lanterman-Petris-Short (LPS) Act.[2] (*Lee*, *supra*, 78 Cal.App.3d at p. 760.) In 1984, the Legislature enacted a bill sponsored by the Department of Mental Health intended to loosen *Lee's* flat prohibition

---

[1] Section 1026.2, subdivision (c) states in full: "A designated facility need not be approved for 72-hour treatment and evaluation pursuant to the Lanterman-Petris-Short Act (Part 1 (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code). However, a county jail may not be designated unless the services specified in subdivision (b) are provided and accommodations are provided which ensure both the safety of the person and the safety of the general population of the jail. If there is evidence that the treatment program is not being complied with or accommodations have not been provided which ensure both the safety of the committed person and the safety of the general population of the jail, the court shall order the person transferred to an appropriate facility or make any other appropriate order, including continuance of the proceedings."

[2] The LPS Act (Welf. & Inst. Code, § 5000 et seq.) "governs the involuntary treatment of the mentally ill in California." (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008.) "Enacted by the Legislature in 1967, the act includes among its goals ending the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious mental disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program." (*Ibid.*)

11

against jail confinement while still affording treatment to NGIs during local detention. (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 1477, p. 2 ["This bill would provide that [an NGI] could be detained in a facility not approved for LPS patients so long as her medication program could continue and the interference with her treatment could be minimized"].) The amendments to section 1026.2 struck that balance by mandating an NGI petitioner could be detained in jail *only if* the jail could continue his or her program of treatment. (Stats. 1984, ch. 1416, § 1.)

Until now, our courts have not had occasion to interpret section 1026.2's prehearing confinement provisions, but we find their meaning to be clear. Taken together, the provisions require the state hospital to summarize the NGI's treatment programs *before the outpatient hearing* and give that summary to the court and community program director so the latter can select an appropriate local confinement facility for the NGI. (§ 1026.2, subd. (b).) The facility selected, whether it be a treatment center or jail, must be able to continue the NGI's treatment while at the same time ensuring they remain safely confined. (§ 1026.2, subds. (b) & (c).) The statute requires the court to oversee this process from beginning to end. The court receives the treatment summary that initiates the designation process and is tasked with transferring the NGI to a different facility if the designated one is unable to provide safe confinement and treatment. (*Ibid.*)

The record in this case contains no indication that any of the requirements in section 1026.2, subdivisions (b) and (c) were followed. The People do not dispute this

conclusion, rather they argue the requirements were immaterial because Endsley did not want to testify in person. The record demonstrates otherwise. Endsley stated clearly and unequivocally that he wanted "very much" to testify at his hearing. Citing to *Lee*, his only objection was to confinement *in jail*. At this point, the trial court should have explained that section 1026.2 afforded him the right to be confined in a therapeutic setting. However, because the court, state hospital, and community program director failed to follow section 1026.2's requirements for designating a confinement facility that could continue his treatment, Endsley was led to believe his only option for testifying in person was to agree to be housed in jail without any provisions for his mental and physical safety.

"[W]here fundamental rights are affected by the exercise of discretion by the trial court, we recognize that such discretion can only be truly exercised if there is no misconception by the trial court as to the legal basis for its action." (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 496.) By presenting Endsley with what amounted to a take-it-or-leave-it option regarding jail confinement, the court demonstrated it was unaware section 1026.2 gives NGI petitioners the right to local confinement in a safe and therapeutic setting. Because it was based on a legal misconception, we are compelled to conclude the court's decision not to allow Endsley to testify was an abuse of discretion. On remand, if Endsley desires to testify, the trial court must follow the procedures set forth in section 1026.2, subdivisions (b) and (c) and oversee the designation of an appropriate facility to house him pending his hearing. If after that process Endsley still refuses to

13

testify in person, he will at least have made a knowing and intelligent waiver of his rights, at which point the trial court has discretion whether to allow him to testify remotely. (See *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1176 [reviewing for abuse of discretion trial court's refusal of telephonic testimony].)

B.    *Right to Appointment of Independent Expert*

Whether indigent NGIs seeking release from civil confinement are entitled to the appointment of an independent expert to assist them with their section 1026.2 petitions is an issue of first impression.  Section 1026.2 is silent on the appointment of experts, and the only case to even mention the issue is *Soiu*, where the court held the NGI was entitled to a hearing on his petition for conditional release, and in so holding noted "the trial court *can* [on remand] consider [his] request for appointment of a medical professional to assist in the outpatient placement hearing."  (*Soiu*, *supra*, 106 Cal.App.4th at p. 1201, italics added.)

Given the lack of authority directly on point, Endsley argues the holding in *McKee*—which involves the statute governing the release of SVPs from involuntary civil commitment—supplies the basis for concluding NGIs are entitled to an independent expert at the outpatient placement hearing stage.  SVPs and NGIs face an essentially identical statutory framework for obtaining release from involuntary civil commitment. Just like for NGIs under Penal Code section 1026.2, there are "'two ways [an SVP] can obtain review of his or her current mental condition to determine if civil confinement is still necessary.  [First,] [Welfare and Institutions Code s]ection 6608 permits a defendant

14

to petition for *conditional* release to a community treatment program. . . .  [Second,] [Welfare and Institutions Code s]ection 6605 [requires] an annual review of a defendant's mental status that may lead to *unconditional* release."'  (*McKee*, *supra*, 47 Cal.4th at p. 1186.)  Also, as with release under Penal Code section 1026.2, an SVP may petition for conditional release on his or her own, "with or without the recommendation or concurrence of the Director of State Hospitals."  (Welf. & Inst. Code, § 6608, subd. (a).)

In *McKee*, the California Supreme Court considered the constitutionality of Proposition 83, which amended the term of an SVP's civil confinement from a fixed two years (at the end of which the prosecution had to prove beyond a reasonable doubt that the defendant still met the definition of an SVP) to an indefinite commitment "from which the [defendant] can be released if he proves by a preponderance of the evidence that he no longer is an SVP." (*McKee*, *supra*, 47 Cal.4th at p. 1184.)  McKee, a recently-committed SVP, argued the amendment violated federal due process because, among other things, it made no provision for the appointment of an independent expert to assist indigent SVP's petition for conditional release.  "As [McKee] points out, although [Welfare and Institutions Code] section 6605, subdivision (d) mandates the appointment of experts when the [Department of Mental Health] authorizes an indigent inmate to petition for release, [Welfare and Institutions Code] section 6608, subdivision (a) merely provides that petitioner has the right to counsel, with no mention of experts, when he petitions without the [Department of Mental Health's] approval." (*Id*. at p. 1192.)

15

The Court agreed that access to an independent medical expert is crucial for SVPs seeking release from involuntary civil confinement.  "[E]xpert testimony is critical in an SVP commitment proceeding, in which the primary issue is not, as in a criminal trial, whether the individual committed certain acts, but rather involves a prediction about the individual's *future behavior*." (*McKee*, *supra*, 47 Cal.4th at p. 1192, italics added.)  The Court reasoned, "If the state involuntarily commits someone on the basis of expert opinion about future dangerousness, places the burden on that person to disprove future dangerousness, and then makes it difficult for him to access his own expert because of his indigence to challenge his continuing commitment, *that schema would indeed raise a serious due process concern*." (*Ibid*., italics added.)  The Court further observed that "the denial of access to expert opinion when an indigent individual petitions on his or her own to be released"—as opposed to when the person in charge of their treatment "authorizes" the petition—could pose "a significant obstacle to ensuring that only those meeting SVP commitment criteria remain committed." (*Id.* at p. 1193.)  Citing the rule that we should "construe statutes when reasonable to avoid difficult constitutional issues," the Court interpreted the SVP statute "to mandate appointment of an expert for an indigent SVP who petitions the court for release." (*Ibid.*)  After *McKee*, the Legislature amended the statute to explicitly provide that an SVP petitioning for conditional release "shall have the right to the appointment of experts, if he or she so requests." (Welf. & Inst. Code, § 6608, subd. (g).)

16

The due process concern articulated in *McKee* applies with equal force to NGIs seeking conditional release. As the Court observed, a finding that a person meets the definition of an SVP is "the functional equivalent of the NGI acquittal." (*McKee*, *supra*, 47 Cal.4th at p. 1191.) NGIs, like SVPs, are involuntarily confined based on expert opinion regarding their future dangerousness. In addition, both groups face a two-step process for release that requires them to successfully complete outpatient treatment in the community and demonstrate to the court they are no longer a danger to the community based on their mental illness. Although Penal Code section 1026.2 does not have a provision similar to Welfare and Institutions Code section 6605 mandating the appointment of an expert when the person in charge of treatment authorizes the petition for release, we do not think this distinction affects the due process analysis. The "serious due process concern" identified in *McKee* was the existence of a statutory scheme that "places the burden on [the civil committee] to disprove future dangerousness, and then makes it difficult for him to access his own expert because of his indigence to challenge his continuing commitment." (*McKee*, at p. 1192.) We conclude the only way to avoid that exact problem in the NGI setting is to interpret Penal Code section 1026.2 to mandate the appointment of an expert for indigent NGIs petitioning for conditional release, if the NGI so requests.

The People do not disagree that *McKee* supports interpreting section 1026.2 to include the right to an appointment of an independent expert. Instead, they contend the error in denying Endsley's request was harmless beyond a reasonable doubt under

17

*Chapman v. California* (1967) 386 U.S. 18 because the trial court found the state's evidence "overwhelming." (See *People v. Hurtado* (2002) 28 Cal.4th 1179, 1194 [*Chapman* test applies to federal constitutional error in civil commitment cases].) This argument does not satisfy us that the error was harmless beyond a reasonable doubt. The trial court concluded the state's case was overwhelming after a hearing consisting solely of state-produced evidence. Endsley did not testify at his hearing nor was he able to produce the opinion of his own expert. We simply cannot know how the proceedings may have differed had he been appointed an expert to help him prepare and present his challenge to continued commitment. For example, we cannot know what the expert would have testified or how it might have impeached or weakened the state's case.

The People's assertion that nothing Endsley could have done would have impacted the court's conclusion is only speculation. As *McKee* explains, access to an independent expert is of fundamental importance in situations like this where a person's freedom from involuntary state-imposed confinement hinges on their ability to disprove the opinions of the state's experts. (*McKee*, *supra*, 47 Cal.4th at p. 1192.) Endsley should receive the opportunity to support his petition with expert opinion. We cannot conclude beyond a reasonable doubt that he could not, with the help of an independent medical expert, alter the trial court's conclusion about his suitability for outpatient treatment.

## III

## DISPOSITION

We reverse the denial of the petition for conditional release.  We direct the trial court to grant Endsley's request for an independent expert to assist him in demonstrating he is ready for outpatient treatment.  Additionally, if Endsley desires to testify at his outpatient placement hearing, we direct the trial court to oversee the designation of an appropriate facility to house him pending his outpatient placement hearing, in accordance with the procedures set out in section 1026.2, subdivisions (b) and (c).

CERTIFIED FOR PUBLICATION

SLOUGH
J.

We concur:


MILLER
Acting P. J.


CODRINGTON
J.

19