[No. G043124. Fourth Dist., Div. Three. Sept. 16, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRY LEE SHIELDS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

[1] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III., IV., V., VI., and VII.

## COUNSEL

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Quisteen Shum and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**O'LEARY, J.**—Terry Lee Shields appeals from a judgment after a jury convicted him of 10 counts of forcible lewd acts on a child under the age of 14, kidnapping to commit a sex offense, three counts of using a minor to produce child pornography, and possession and control of child pornography, and found true he had substantial sexual contact with the victims, and he kidnapped a victim and the movement substantially increased the risk of harm to the victim. Shields argues (1) three counts of using a minor to produce child pornography was unauthorized and violated his federal and state equal protection rights; (2) the court erroneously failed to hold a hearing to determine whether his defense counsel should have been substituted; and (3) there were numerous sentencing errors. As we explain below, we agree there were sentencing errors. None of his other contentions have merit, and we affirm the judgment as modified.

FACTS[2]

*Counts 8–11/J.H. & Counts 12–14/J.H.2*

J.H., who was born in December 1990, and her younger sister, J.H.2, who was born in October 1995, and is autistic, rode the school bus to school in

---

[2] Because all but one of Shields's contentions concern his sentence, we provide an abbreviated discussion of the facts.

June 1999. Shields drove the school bus. The girls' mother befriended Shields and invited him to their home on holidays and family birthday parties. She also asked Shields to babysit her daughters. While babysitting the girls, Shields removed J.H.'s pants and underpants and touched her vagina with his hands on three separate occasions. Shields also showed J.H. a pornographic movie. Shields babysat J.H.2 on three separate occasions in September 2002, May 2003, and September 2003, while her father, mother, and sister were out of town.

*Counts 1–7/A.L.*

On June 9, 2004, seven-year-old A.L. was walking to school when Shields stopped his car, honked, and told her that he would take her to Disneyland. A.L. got into the car because she was afraid, and Shields made her get into the trunk, which was accessible from the backseat. He gave her something to drink, but she spilled it on the floor because she thought it was beer. Shields drove her to a house. Shields, who was nude, made A.L. take off her clothes, told her to stop crying, and forced her to pose for photographs. Shields kissed A.L.'s breasts and vagina, and rubbed his penis on her vagina. Shields held A.L. down and first put his penis inside her vagina and then put his penis in her mouth. Shields left A.L. at a McDonald's, and she walked to a carwash. Someone found her and called the police.[3]

*Count 15*

Two years later, Shields was at an Internet café when an employee saw him looking at what appeared to be child pornography on a computer. The employee called the police. Officers found Shields sitting at a computer and they took him outside. Shields told them he had been at the Internet café for about three hours looking at pornography when he saw pictures of children and downloaded them because he was curious. Officers found a computer disk in the disk drive of the computer Shields had been using. The computer disk contained seven images of young men and women having sex. Officers arrested Shields for possession of child pornography. After advising Shields of his *Miranda*[4] rights, Shields wrote he downloaded the images to turn them over to law enforcement and denied being sexually aroused by the images and denied being interested in children.

---

[3] At trial, A.L. testified she could not remember the details of what happened that day. The jury, however, watched a videotape of her interview with a Child Abuse Services Team member and a detective. A.L. denied anyone looked at or touched her genitals, or photographed or videotaped her. After the detective showed A.L. a picture of A.L., and A.L. said the photograph was not of her, the detective asked A.L. to tell her what probably happened to the girl in the photograph. A.L. provided the details stated above.

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

*The Investigation*

The next day, a detective interviewed Shields. After a detective advised him of his *Miranda* rights, Shields said the child pornography images "just pop[ped] up" and he downloaded them to give to the police. He denied being sexually aroused by the photographs.

Officers obtained a search warrant for Shields's car. Officers found a backpack containing topical anesthetic cream, condoms, lubricant, vibrators, dildos, a pacifier, and a Grim Reaper mask. Officers also found dolls, stuffed animals, video and camera equipment, binoculars, a copy of American Cheerleader magazine, women's underwear, lollipops, and a Little Mermaid bracelet.

Officers also obtained search warrants for Shields's storage units. Officers found lidocaine, sodium chloride, obstetrical towels, DVD's, CD's (compact discs), a bra, women's underpants, and pornographic magazines, including one titled "Child."

Finally, officers obtained a search warrant for a room Shields was renting. Officers found a computer containing over 2,000 pornographic images of children around the age of six or seven years old. They also found a lockbox containing 26 videotapes, 34 DVD's, 42 computer disks, a photographic album, photographs of children in various states of undress, and women's underpants. The photographic album contained photographs of young women estimated to be between the ages of 17 and 22, with each picture showing the women wearing less clothing. One of the women pictured in the album also appeared on one of the videotapes. The videotape showed Shields photographing the woman and having sex with her. One of the videotapes depicted a girl approximately 13 years old wearing a nightgown that she lifted up to expose her pubic area. There were also several photographs of the girl. The girl in the videotape and photographs was identified as J.H. Another videotape showed two females, one of whom was nude, lying on separate beds in a motel room. The videotape showed Shields holding a vibrator to the nude female's vagina while she spread her legs. Seventeen of the computer disks contained images of child pornography. The disks included 70 images of children engaged in sexual activity. Twelve of the pornographic images were of a young girl named J.R. Fourteen of the pornographic images were of J.H. and J.H.2. Three of the computer disks included seven videos depicting child pornography. One of the CDs was labeled "A[]L. 7 yo." This CD included photographs showing A.L. sitting nude on a toilet, spreading her legs, holding a vibrator, and touching her vagina with her hands.

At some point in October, Shields called his landlord and told her he had a "shameful secret" and he had been arrested because of "a sin of his" for which he wanted to die. There was additional child pornography in the residence.

*Trial Court Proceedings*

An information charged Shields with the following: A.L.—three counts of forcible lewd acts on a child under the age of 14 (Pen. Code, § 288, subd. (b)(1))[5] (counts 1–3), kidnapping to commit a sex offense (§ 209, subd. (b)(1)) (count 4), and three counts of using a minor to produce child pornography (§ 311.4, subd. (c)) (count 5—penetration of vagina, count 6—masturbation, and count 7—posing nude); J.H.—four counts of committing lewd acts on a child under the age of 14 (§ 288, subd. (a)) (counts 8–11); J.H.2—three counts of committing lewd acts on a child under the age of 14 (§ 288, subd. (a)) (counts 12–14); and possession and control of child pornography (§ 311.11, subd. (a)) (count 15). With respect to counts 1 to 3 and 8 to 14, the information alleged Shields committed lewd acts on multiple children and he had substantial sexual conduct with a child (§§ 1203.066, subd. (a)(7), (8), 667.61, subds. (b), (e)(1)). As to counts 1 to 3, the information alleged he kidnapped the victim and the movement of the victim substantially increased the risk of harm to the victim (§ 667.61, subds. (a), (b), (d)(2), (e)(5)).

Pursuant to Evidence Code section 1108, the prosecutor offered the testimony of J.R., who was 21 years old at the time of trial. J.R. testified that when she was 12 years old, Shields was the bus driver at her school and a friend of her foster mother's. She stated Shields gave her gifts. J.R. said that before she moved to another nearby foster home, Shields gave her his telephone number. She testified Shields showed up at her new foster home one day, picked her up, picked up another woman (who J.R. later learned was a prostitute), and went to a motel. J.R. stated she and the woman took a bath together and the woman shaved J.R.'s vaginal area and used a vibrator on her; Shields took photographs. J.R. explained Shields gave her blue thong underpants and a blue nightgown, which he told her to put on. J.R. said she and the woman moved to the bed and the woman orally copulated her while Shields took photographs. J.R. testified that on another occasion, Shields took her to an airport parking lot in a van where they touched each other's genitals and orally copulated each other; Shields videotaped this encounter.

---

[5] All further statutory references are to the Penal Code, unless otherwise indicated.

The prosecutor offered the testimony of Dr. Jody Ward, a clinical and forensic psychologist, who testified concerning child sexual abuse accommodation syndrome, including secrecy, helplessness, entrapment and accommodation, delayed unconvincing disclosure, and retraction or recantation.

Shields rested on the state of the evidence.

The jury convicted Shields of all counts and found all allegations true. At the sentencing hearing, defense counsel stated she was ready to proceed with sentencing. After the victim impact statements and the prosecutor's argument, defense counsel stated she did not wish to make any argument. In response to the trial court's questions concerning the propriety of indeterminate sentences on some of the counts, the prosecutor requested a short recess to retrieve relevant case authority. When back on the record, defense counsel asked to briefly speak with Shields. The court agreed and defense counsel spoke with Shields. Defense counsel stated, "I am sorry, your honor, I just need a few minutes." The court again agreed. Defense counsel stated they were ready to proceed. When the court stated it was proceeding with sentencing and asked whether Shields waived arraignment for sentencing and "no legal cause," defense counsel replied, "Yes."

The trial court sentenced Shields to prison for 151 years to life as follows: 25 years to life on count 1; 15 years to life for each of counts 8 to 14; eight years for each of counts 2 and 3; three years on count 5; and eight months for each of counts 6, 7, and 15. With respect to counts 6 and 7, the court reasoned it was imposing consecutive terms because "they are separate photographs obviously taken separately, they are photographs of two different victims." The court stayed the life sentence on count 4 pursuant to section 654. The court "impose[d] a restitution fine of $10,000 on each of counts 1, count 8[,] and count 12." The court explained that was a $10,000 fine for each victim. The court also imposed a parole revocation fine in the amount of $200 for each victim. The court ordered Shields "not to have any contact with any of the victims." The court awarded him 1,135 days of actual credit and 170 days for local conduct credit for a total of 1,305 days presentence custody credits.

After the trial court had pronounced sentence, advised Shields of his posttrial rights, and remanded Shields to the sheriff's custody, defense counsel informed the trial court that Shields wanted to address the court. The court asked why. Defense counsel replied, "I believe he has got case law in front of him with regards to ineffective assistance of counsel. And a new trial order. I believe he wants to have a new trial ordered based on [ineffective assistance of counsel]." The court stated: "Okay. Well, it is a little untimely to

be doing that now after the sentence, because a motion for a new trial is one of the bases for a legal cause as to why judgment should not now be pronounced, and there was no legal cause stated, and the judgment has been imposed. So those are matters I think you are going to have to take up by way of appeal or way of writ, if you think that there is a valid basis for any objection to the judgment that has been ordered. Okay. So the judgment will remain."

## DISCUSSION

### I. *Section 311.4—Counts 5, 6, and 7*

Shields argues we must reverse two of his three convictions for violating section 311.4 because his conduct constituted a single violation of the statute and the three convictions violate his federal and state equal protection rights. The Attorney General contends Shields forfeited appellate review of this issue because he did not object below and his contentions are meritless. We will address the merits of Shields's claims. (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1324–1325 [98 Cal.Rptr.3d 477] (*Spencer S.*) [appellate courts have discretion to address constitutional issues raised on appeal where issue pure question of law turning on undisputed facts].)

Section 311.4, subdivision (c), provides in relevant part: "Every person who, with knowledge that a person is a minor under the age of 18 years, or who, while in possession of any facts on the basis of which he or she should reasonably know that the person is a minor under the age of 18 years, knowingly promotes, employs, uses, persuades, induces, or coerces a minor under the age of 18 years . . . to engage in or assist others to engage in either posing or modeling alone or with others for purposes of preparing any representation of information, data, or image, including, but not limited to, any film, filmstrip, photograph, negative, slide, photocopy, videotape, video laser disc, computer hardware, computer software, computer floppy disc, data storage media, CD-ROM, or computer-generated equipment or any other computer-generated image that contains or incorporates in any manner, any film, filmstrip, or a live performance involving, sexual conduct by a minor under the age of 18 years alone or with other persons or animals, is guilty of a felony." .

### A. *Applicability*[6]

Shields asserts section 311.4 does not authorize a separate violation for each piece of media created involving the same victim on the same occasion.

---

[6] In his reply brief, Shields claims the Attorney General failed to respond to this claim and thus conceded it. The Attorney General responded to this contention when she argued the Legislature enacted section 311.4 to prevent the sexual exploitation of children.

There are no published cases addressing the issue before us. In answering this question, the plain language of section 311.4, subdivision (c), and its legislative history are instructive.

 " ' "When we interpret the meaning of statutes, our fundamental task is to ascertain the aim and goal of the lawmakers so as to effectuate the purpose of the statute." [Citation.] "We take a three-step sequential approach to interpreting statutory language. [Citation.] First, we will examine the language at issue, giving 'the words of the statute their ordinary, everyday meaning.' [Citations.] If we conclude that the statutory meaning is free of doubt, uncertainty, or ambiguity, the language of the statute controls, and our task is completed. [Citations.] Second, if we determine that the language is unclear, we will attempt to determine the Legislature's intent as an aid to statutory construction. [Citation.] In attempting to ascertain that intent, 'we must examine the legislative history and statutory context of the act under scrutiny. [Citations.]' [Citation.] Third, if the clear meaning of the statutory language is not evident after attempting to ascertain its ordinary meaning or its meaning as derived from legislative intent, we will 'apply reason, practicality, and common sense to the language at hand. If possible, the words should be interpreted to make them workable and reasonable [citations], . . . practical [citations], in accord with common sense and justice, and to avoid an absurd result [citations].' [Citation.]" [Citation.]' [Citation.]" (*Sacks v. City of Oakland* (2010) 190 Cal.App.4th 1070, 1082 [120 Cal.Rptr.3d 1].)

Here, section 311.4, subdivision (c)'s plain language authorizes multiple convictions for each piece of media created. The statute makes it a crime for any person to knowingly "promote[], employ[], use[], persuade[], induce[], or coerce[]" a minor the person knows or should reasonably know is under the age of 18 years to pose or model to prepare "any film, filmstrip, photograph, negative, slide, photocopy, videotape, video laser disc, computer hardware, computer software, computer floppy disc, data storage media, CD-ROM, or computer-generated equipment or any other computer-generated image that contains or incorporates in any manner, any film, filmstrip, or a live performance involving, sexual conduct . . . ."

Section 311.4 contemplates that if a person knowingly coerces a minor to pose for a sexual "photograph," that person violates section 311.4. When identifying the relevant media, the Legislature used the singular and not the plural. The Legislature did not prohibit a person from knowingly coercing a minor to pose for sexual *"photographs."* We decline Shields's invitation to read into section 311.4 a limitation the Legislature did not include. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 273 [105 Cal.Rptr.2d 457, 19 P.3d 1196] [we presume Legislature says what it means and give effect to plain language of statute where no ambiguity].) Additionally, the Legislature did

not include in section 311.4 any language suggesting a person who knowingly coerces a minor to pose for sexual "photographs" can only suffer one conviction. (See § 288.5 [defendant may only be charged with one count under section unless multiple victims].) Finally, we find analogous the situation where a defendant may be convicted of multiple sex acts during a single encounter. (§§ 288, 289; *People v. Scott* (1994) 9 Cal.4th 331 [36 Cal.Rptr.2d 627, 885 P.2d 1040]; *People v. Harrison* (1989) 48 Cal.3d 321, 329 [256 Cal.Rptr. 401, 768 P.2d 1078].)

Although we conclude section 311.4's plain language authorizes multiple convictions for multiple media, section 311.4's legislative history compels the same conclusion. As Shields correctly notes, the Legislature enacted section 311.4 to prevent the abuse and exploitation of children. "Enacted in 1961, section 311.4 is part of a statutory scheme ' "to combat the exploitive use of children in the production of pornography." ' [Citation.] The statute is 'aimed at extinguishing the market for sexually explicit materials featuring children.' [Citation.] The Legislature was particularly concerned 'with visual displays such as might be found in films, photographs, videotapes and live performances,' and section 311.4 thus 'prohibits the employment or use of a minor . . . in the production of material depicting that minor in "sexual conduct." ' [Citation.]" (*People v. Cochran* (2002) 28 Cal.4th 396, 402 [121 Cal.Rptr.2d 595, 48 P.3d 1148].)

The Legislature's purpose in enacting section 311.4 is to prevent the abuse and sexual exploitation of children by extinguishing the market for child pornography. When a person creates multiple photographs of child pornography, the person adds to the market more than the person who creates one photograph of child pornography. Each additional photograph further exploits the minor victim, and the Legislature clearly intended to prevent that exploitation by criminalizing its creation. The Legislature's attempt to end the exploitation of children by criminalizing the creation of each item of child pornography can be contrasted to the possession of child pornography. (See *People v. Manfredi* (2008) 169 Cal.App.4th 622, 634 [86 Cal.Rptr.3d 810] [possession of child pornography one offense]; *People v. Hertzig* (2007) 156 Cal.App.4th 398, 403 [67 Cal.Rptr.3d 312] [*possession* of 30 video images of child pornography one crime under § 311.1 because crime is possession and not the act of abusing or exploiting children].)

Shields states he fails to comprehend how any legislative purpose could be advanced by an interpretation of the statute that allows for an unlimited number of charges and convictions where only a single charge could result in punishment. Above, we explain how section 311.4's plain language authorizes multiple convictions for multiple media/photographs. Additionally, section 654 only precludes multiple punishment, not multiple convictions. (*In re Pope* (2010) 50 Cal.4th 777, 784 [114 Cal.Rptr.3d 225, 237 P.3d 552].)

■ Shields states he found no case that involved more than one conviction with one victim on a single occasion. That there is no reported case involving multiple convictions for multiple photographs does not mean section 311.4 forbids it. Therefore, section 311.4's plain language and legislative history compel the conclusion multiple conviction for multiple media is permitted.

## B. *Equal Protection*

Shields claims his three convictions violate the federal and state equal protection clauses because section 311.4 as applied allowed similarly situated persons to be treated differently and there is no rational basis to a legitimate governmental purpose. We disagree.

■ "When a statute is challenged on equal protection grounds, a court's initial inquiry is twofold. It must first determine whether ' "the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' [Citation.] [¶] If the statute affects similarly situated groups unequally, the court must then decide whether to apply the strict scrutiny or rational basis test in analyzing the statute's constitutionality. 'For most legislation . . . a court will apply the rational basis test. The "standard formulation of the test for minimum rationality" [citation] is whether the classification is "rationally related to a legitimate governmental purpose." ' [Citation.] 'A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." ' [Citation.] [¶] . . . '[A] statute, once duly enacted, "is presumed to be constitutional. Unconstitutionality must be clearly shown, and doubts will be resolved in favor of its validity." ' [Citation.]" (*Spencer S., supra*, 176 Cal.App.4th at pp. 1324–1325.) Federal and state equal protection analysis is substantially the same. (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 571–573 [117 Cal.Rptr.2d 168, 41 P.3d 3].)

"As to the first prong of the inquiry described above, minor bears the burden of showing, as a foundational matter, that the challenged classification affects similarly situated groups unequally. [Citation.]" (*Spencer S., supra*, 176 Cal.App.4th at p. 1325.) Shields contends section 311.4 affects similarly situated persons differently because a person who creates one lengthy videotape could only suffer one conviction whereas someone who took multiple photographs could suffer multiple convictions.

Shields draws the wrong comparison. Of course there is a difference between creating three photographs of child pornography and one videotape

of child pornography just as there is a difference between being convicted of three counts of rape based on three penetrations and one count of rape based on one penetration. The proper comparison is a person who creates three photographs of child pornography and three videotapes of child pornography. In both cases, the person could be charged with three counts of violating section 311.4. Thus, section 311.4 does not treat similarly situated persons differently.

As to the second prong, Shields argues there is no rational basis for allowing someone who took multiple photographs on a single occasion to suffer multiple convictions while someone who created one lengthy videotape could suffer only one conviction. Although we have concluded section 311.4 as applied does not affect similarly situated persons differently, we will briefly discuss the second prong of the analysis. As we explain above, the Legislature enacted section 311.4 to prevent the abuse and sexual exploitation of children by extinguishing the market for child pornography. Needless to say this is a legitimate government interest. Even were we to conclude section 311.4 as applied affected similarly situated persons differently, there is a rational basis for treating those who create multiple photographs of child pornography as more culpable than those who create one lengthy videotape. Those who create multiple photographs of child pornography contribute to the child pornography marketplace to a greater degree than those who create a single videotape. Thus, Shields's three convictions for violating section 311.4 did not violate his federal and state equal protection rights.

II.–VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

We modify the judgment to reflect the trial court stayed the sentences on counts 6 and 7, imposed a no-visitation order between Shields and the child victims, and imposed a $10,000 restitution fine and a $10,000 parole revocation fine. In all other respect, the judgment is affirmed.

The clerk of the superior court is directed to prepare a new abstract of judgment reflecting the following: (1) the eight-month sentences on counts 6 and 7 are stayed; (2) the trial court imposed a no-visitation order pursuant to section 1202.05; (3) the imposition of a $10,000 restitution fine and a $10,000 parole revocation fine; (4) Shields is entitled to 1,177 days of actual credit and 176 days of local conduct credit for a total of 1,353 days of

*See footnote, *ante*, page 323.

presentence custody credit; and (5) the sentence on count 4 is stayed. The clerk is directed to forward a copy to the Department of Corrections and Rehabilitation, Division of Adult Operations.

Rylaarsdam, Acting P. J., and Moore, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 14, 2011, S197406.