Filed: 2/27/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Conservatorship of the Person and Estate of E.B.. | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUNTY, | A157280 |
| Petitioner and Respondent, | |
| v. | (Contra Costa County Super. Ct. No. P18-01826) |
| E.B., | |
| Objector and Appellant. | |

Appellant E.B. was found to be gravely disabled following a jury trial at which he was called as a witness over his objection. He appeals from an order appointing respondent the Public Guardian of Contra Costa County (public guardian) as his conservator under the Lanterman-Petris-Short (LPS) Act and determining that his current placement in a mental health rehabilitation facility was the least restrictive and most appropriate placement. (Welf. & Inst. Code, § 5350, 5358, subd. (c)(1).) Appellant's sole contention is that he had a right to refuse to testify under the equal protection clause, because that right has been statutorily granted in proceedings to extend the commitment of persons found not guilty by reason of insanity (NGI), and he is entitled to the same protection. (Pen. Code, § 1026.5.) We respectfully disagree with the recent decision in

1

*Conservatorship of Bryan S.* (2019) 42 Cal.App.5th 190 (*Bryan S.*) and conclude that LPS conservatees are similarly situated with NGI's and with individuals subject to other involuntary civil commitments for purposes of the right against compelled testimony. But because the error was harmless in this case, we affirm.

## I. BACKGROUND

Appellant has been diagnosed with schizophrenia. He was placed under an LPS temporary conservatorship and on November 14, 2018, the public guardian filed a petition under the LPS Act seeking appointment of a conservator and alleging that appellant was gravely disabled as a result of a mental disorder, was unable or unwilling to accept treatment voluntarily, and was unable to manage his financial resources. The court denied appellant's written objection to compelled testimony and a jury trial was held at which appellant was called as one of three witnesses who testified.

### A. *Dr. Levin*

Psychiatrist Michael Levin, M.D., worked for Contra Costa County at the Concord Mental Health Clinic and evaluated clients for the public guardian's office. He testified that appellant had diagnostic symptoms of schizophrenia in the area of affect. Appellant was blunted and flat, and showed signs of "thought blocking," where he would stop during conversations and be in his own thoughts for a while. One reason for thought blocking is auditory hallucinations. Appellant takes three drugs to treat his schizophrenia: the mood stabilizer Lithium Carbonate, the highest dose of a monthly injection called Invega Sustenna, and a very potent medication called Clozaril, which requires that a patient's white cell blood count be taken weekly. Appellant had told Dr. Levin that people have said he has schizophrenia, but he has it "[n]ot that much."

2

In Dr. Levin's opinion, appellant had signs of anosognosia, meaning he had limited insight into his illness and it would be more difficult for him to cooperate with treatment. He had last worked 12 to 13 years ago assisting his father as a mechanic, and had been living on supplemental security income (SSI) ever since. Dr. Levin believed that appellant was gravely disabled and has a major psychiatric illness. When appellant decompensates, he becomes more agitated, labile (emotionally unstable) and paranoid. Dr. Levin did not believe appellant would be able to negotiate for food and shelter, noting that he has not been able to do so in the past and that his current plan was to return to an apartment where he had previously lived.

B. *James Grey*

James Grey, a licensed marriage and family therapist, first had contact with appellant when Grey was employed as a mental health clinical specialist at the Concord Adult Mental Health Clinic. He testified that he began assisting as appellant's case manager in 2016, because appellant's paranoid behaviors were causing his housing to be at risk. Appellant was then living in a specialized housing program that reduced his rate of rent so he could live independently on SSI. He had removed and attempted to change door locks, vandalized the apartment and taken the heater off the wall to look for monitoring devices. Grey set up clinic appointments and offered appellant transportation, but appellant was inconsistent in complying with medication and treatment. Sometimes, he was agitated and unwilling to go to the clinic.

Grey noticed that appellant had bottles of medication that were months old, as well as unfilled prescriptions written by the psychiatrist. Appellant failed to cash many of his weekly checks for personal needs, which Contra Costa County issued to appellant in its role as his money manager. Appellant once refused to cash a check at a bank because there were female

3

tellers and he thought they were judging him because the check had the County's name on it.

In 2017, Grey went to work with the public guardian and was assigned to appellant's case as deputy conservator after a temporary conservatorship was ordered. Appellant was being treated at San Jose Behavioral Health, an in-patient hospital for people with mental illnesses, which released him to a shelter against the advice of Grey, who did not believe appellant could provide for his own food, clothing or shelter. Appellant ended up in an emergency psychiatric facility within a week, was again discharged against Grey's advice, and was transferred to an inpatient psychiatric emergency hospital. From there, he went to Contra Costa Medical Center and later to Crestwood Napa Valley, also known as Crestwood Angwin. Grey visited appellant at the hospital and Crestwood, where he found him to be guarded and paranoid, with an extremely flat affect and a disorganized thought process. Appellant sometimes believed his mother was not actually his mother and that people around him were out to get him. He still failed to take his medications and adhere to treatment with Grey as his case manager. During the last few weeks before trial, Grey had met with appellant and he reluctantly took his medication in an agitated, frustrated manner. Appellant's only plan if released was to return to his old apartment, but he did not present Grey with a lease or other verification he had rented the unit.

C. *Appellant*

Appellant testified that he had been staying at a board and care in Angwin, and before that he had been in a mental health unit. Asked if he knew why he was there, appellant responded, "I didn't know T-Con had to deal with being here and being there. It has nothing to do with each other." He then testified that Grey said he needed extra care. Asked what he wanted

4

to happen, he said, "Oh, I even kind of have really spoken not too clearly about this. But I'm more towards the neutrality and leaving enough area of a cushion that I could have—so I could leave the temporary conservatorship because maybe it's that I don't need it. And I know I have a mental health— mental health. [¶] I know what it is. I live with it. I take medications for it. When I know I don't need medications, I don't need medications. [¶] But if you will there's always a little strike pad here that we can always roughly just braze and find my history find out my – and my future means too. I'm trying to save this for myself."

Asked if he believed he had a mental disorder, appellant testified that he had attention deficit disorder as a kid, and then it changed. "I just had a learning disability. They didn't say anything about anxiety disorders or any manic problem or anything else like that." Asked about his medication, he named Lithium Carbonate and Clozaril. He didn't really understand why he was taking these medications; the medical doctors just decided he would take them. "I was admitted out of unbreeching contract. There's something just going on." He acknowledged that he was "sort of still dependent" on the program at Angwin. He would take his medications if released from the hospital and would get them at Rite Aid. Asked how he would pay for food if released, appellant said, "Pay for food? Rely on the conservatorship."

## II. DISCUSSION

A person is "gravely disabled" and may be placed in an LPS conservatorship when he or she has, "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (Welf. & Inst. Code, § 5008, subd. (h)(1).) Appellant contends, as a matter of equal protection, that in the jury trial on the petition to establish an LPS conservatorship under this

5

provision, he should not have been compelled to testify over his objection. We agree that he is similarly situated to persons subject to involuntary civil commitments who are not compelled to testify against themselves and that the court should have held an evidentiary hearing on whether the disparity was justified.

A. *Equal Protection—Disparate Treatment of LPS Conservatees*

"Under both the United States and California Constitutions, a person has the right to refuse to answer potentially incriminating questions put to him or her in any proceeding; in addition, the defendant in a criminal proceeding enjoys the right to refuse to testify at all." (*People v. Dunley* (2016) 247 Cal.App.4th 1438, 1446 (*Dunley*); see U.S. Const., 5th & 14th Amends.; Cal. Cont., art. 1, § 15.) There is no constitutional right to refuse to testify in civil proceedings, including in LPS commitment proceedings. (*Cramer v. Tyars* (1979) 23 Cal.3d 131, 137–138 (*Cramer*); *Conservatorship of Bones* (1987) 189 Cal.App.3d 1010, 1017 (*Bones*); *Conservatorship of Barber* (1984) 153 Cal.App.3d 542, 550 (*Barber*).)

In *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 818 (*Hudec*), our Supreme Court concluded that persons who had been found NGI could not be compelled to testify at commitment extension hearings even though they were civil in nature because Penal Code section 1026.5, subdivision (b)(7), which governs such proceedings, incorporates " ' "the rights guaranteed under the federal and State Constitutions for criminal proceedings." ' " (*Id.* at p. 826, italics omitted.) *Hudec* thus recognizes that persons subject to an NGI extension proceeding have a statutory right not to testify against themselves, even if they do not have a constitutional right not to do so.

Appellant acknowledges that there is no constitutional right not to testify against oneself in conservatorship trials, and further acknowledges

6

that the LPS Act does not create a statutory right similar to the NGI statute. (*Bones, supra*, 189 Cal.App.3d at p. 1017; *Barber, supra*, 153 Cal.App.3d at p. 550.)  But he argues that equal protection principles require that we apply the same rule regarding compelled testimony in LPS proceedings as we do under *Hudec* in NGI proceedings.

" ' "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly* situated groups in an unequal manner." [Citations.]  This inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' [Citation.]  In other words, we ask at the threshold whether two classes that are different in some respects are sufficiently similar with respect to the laws in question to require the government to justify its differential treatment of these classes under those laws." (*People v. McKee* (2010) 47 Cal.4th 1172, 1202 (*McKee*).)  If the two groups are similarly situated, the next question is whether the state has justified the disparate treatment, applying either the "rational basis" or "strict scrutiny" test, as appropriate, to analyze the statute's constitutionality.  (*People v. Shields* (2011) 199 Cal.App.4th 323, 333.)

In *McKee, supra*, 47 Cal.4th at pages 1183–1184, the court considered whether equal protection principles were violated by an amendment that changed the two-year commitment term for sexually violent predators (SVP's) to an indeterminate term from which the SVP could be released only if he proved by a preponderance of the evidence that he no longer qualified under the law.  The defendant argued SVP's were similarly situated to mentally disordered offenders (MDO's) for the purpose of obtaining release from commitment, yet the latter remained subject to a commitment for only a

7

limited term. (*Id.* at pp. 1200–1203, 1207.) The Court rejected an argument by the People that differences in the definitions and treatment of SVP's and MDO's and the dangers posed by those groups rendered them dissimilar for equal protection analysis. (*Id.* at p. 1202.) The Supreme Court found persons committed under the different statutes were similarly situated for purposes of the conditions for release from their commitments. "All that the above passage demonstrates is the incontrovertible point that SVP's and MDO's do not share identical characteristics. But the identification of the above differences does not explain why one class should bear a substantially greater burden in obtaining release from commitment than the other." (*Ibid.*) It remanded the case for an evidentiary hearing on whether the disparate treatment was justified.[1]

Looking to the first prong of equal protection analysis, appellant argues that because LPS conservatees may be involuntarily confined in state hospitals as a result of their mental illness, they are similarly situated with NGI's. (Welf. & Inst. Code, § 5358, subd. (a)(2).) A number of cases have looked to *Hudec* and found that a rule allowing compelled testimony in cases involving commitments under the MDO or SVP laws may violate equal protection because SVP's and MDO's are similarly situated to NGI's for the purpose of compelled testimony. (*People v. Flint* (2018) 22 Cal.App.5th 983, 989–991 [SVP's similarly situated to NGI's; case remanded for evidentiary hearing on whether disparate treatment justified]; *People v. Alsafar* (2017) 8 Cal.App.5th 880, 887 [MDO's are similarly situated to NGI's; appeal dismissed as moot]; *People v. Field* (2016) 1 Cal.App.5th 174, 196–197 [SVP similarly situated to NGI for purposes of testimonial privilege; case

---

[1] In *People v. McKee* (2012) 207 Cal.App.4th 1325, 1347, the court on remand upheld the electorate's reasons for treating SVP's more harshly than MDO's.

remanded for evidentiary hearing on justification for different treatment];
*Dunley*, *supra*, 247 Cal.App.4th at pp. 1450, 1453–1454, fn. 14 [MDO's are
similarly situated to NGI's and SVP's for purposes of right of refusing to
testify; appeal dismissed as moot]; *People v. Landau* (2016) 246 Cal.App.4th
850, 864–865 [determining that SVP's are similarly situated to NGI's and
allowing parties to address on remand whether different treatment is
justified]; *People v. Curlee* (2015) 237 Cal.App.4th 709, 715–717 [determining
that SVP's are similarly situated to NGI's for purposes of the right of refusing
to testify but remanding matter for an evidentiary hearing regarding
whether the difference in treatment is justified].)  The reasoning of these
cases applies with equal force to LPS commitment proceedings, at least for
the purpose of the testimonial privilege.

Although the LPS statute focuses on the prompt evaluation and
treatment of persons with serious mental disorders without respect to their
criminal activities (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 540),
this does not change the nature of the confinement under its provisions and
the resulting deprivation of liberty.  "The extent to which liberty is at stake
can be ascertained by reviewing exactly what awaits an individual subjected
to a grave disability proceeding.  When the establishment of a
conservatorship is recommended, the court may appoint a temporary
conservator who has the power to keep the individual in a treatment facility
for up to six months pending the outcome of a trial on the issue of grave
disability.  ([Welf. & Inst. Code], §§ 5352.1, 5353.)  If the individual is found
to be 'gravely disabled,' the court then appoints a conservator and specifies
the powers which the conservator will possess.  ([Welf. & Inst. Code], §§ 5357,
5358.)  One of the principal powers which the court may grant a conservator
is the right to place a conservatee in an institution.  Unlike a person who is

9

found to be imminently dangerous to others. . . , the person who is found to be gravely disabled can be involuntarily confined in a mental hospital for up to a year by his or her conservator, with the possibility of additional year-long extensions. ([Welf. & Inst. Code], §§ 5358, 5361.) The period of temporary conservatorship is not included in the one-year period. ([Welf. & Inst. Code], § 5361.) If the conservator petitions to reestablish an expiring conservatorship, the court may order the conservatee confined past the termination date until renewal proceedings are completed. ([Welf. & Inst. Code], § 5361.) In effect, these statutes assure in many cases an unbroken and indefinite period of state-sanctioned confinement. 'The theoretical maximum period of detention is *life* as successive petitions may be filed . . . .' " (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 223-224.)

An LPS conservatee thus faces an involuntary commitment similar to NGI's (and MDO's and SVP's) even if the reason behind that commitment is more benevolent. The reasons underlying an LPS commitment, while not identical to civil commitment schemes applicable to those who have been convicted of crimes, overlap with them. The primary purpose of NGI extension proceedings and MDO and SVP commitments is to protect the public from people found dangerous to others and who need treatment for a mental disorder, but an ancillary purpose is to provide mental health treatment for the disorder. (*Dunley*, *supra*, 247 Cal.App.4th at pp. 1448–1449; *Hudec*, *supra*, 60 Cal.4th 823 [NGI extension]; *In re Qawi* (2004) 32 Cal.4th 1, 9 [MDO]; *Curlee*, *supra*, 237 Cal.App.4th at p. 720 [SVP].) And, while an LPS conservatee need not be proved dangerous to the public in all circumstances, one purpose of the LPS Act is to "guarantee and protect public safety." (Welf. & Inst. Code, § 5001, subd. (c).) Indeed, one definition of "grave disability" for purposes of an LPS conservatorship requires that the

10

conservatee be found dangerous to others: a so-called Murphy conservatorship may be established under the LPS law when a person currently charged with "a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person," and for which probable cause has been found, has been found mentally incompetent but represents a substantial danger of physical harm to others by reason of the mental disease, defect or disorder. (Welf. & Inst. Code, § 5008, subd. (h)(1)(B); *People v. Karriker* (2007) 149 Cal.App.4th 763, 775; see Welf. & Inst. Code, § 5300, subds. (a)(1), (a)(2) & (a)(3) [confinement for up to 180 days under LPS Act upon showing that person "presents a demonstrated danger of inflicting substantial physical harm upon others"].)

Moreover, many of the same procedural protections apply in a trial to declare someone an LPS conservatee as apply in other proceedings to establish involuntary commitments. As with NGI extension proceedings, MDO proceedings, and SVP proceedings, a proceeding to declare a conservatorship under the LPS statute requires that the government bear the burden of proof beyond a reasonable doubt, and that the subject of the petition have the right to a jury trial and a unanimous verdict. (*Hudec*, *supra*, 60 Cal.4th 821–822, 828 [NGI extension]; *Conservatorship of John L.* (2010) 48 Cal.4th 131, 143 [LPS conservatorship]; *McKee*, *supra*, 47 Cal.4th at pp. 1201–1202 [describing MDO proceedings]; *Curlee*, *supra*, 237 Cal.App.4th at p. 719–720 [SVP proceedings].)[2] While we do not doubt that there are some purposes for which an LPS conservatee is dissimilar to those subject to involuntary commitments by reason of their criminal history and dangerousness, the public guardian has offered no compelling reason why

---

[2] In an initial trial on an insanity defense, the defendant has the burden of proof by a preponderance of the evidence of proving insanity. (*In re Franklin* (1972) 7 Cal.3d 126, 141.)

these procedural protections should not include the right against compelled testimony.

The public guardian argues against the conclusion that LPS conservatees are similarly situated to NGI's, SVP's and MDO's, pointing out that those other three groups are subject to their civil commitment only because they have been found guilty of committing a crime and currently pose a danger to others. (Pen Code, §§ 1026. subd. (a) [NGI plea requires court to first conduct trial on issue of guilt in which the defendant is conclusively presumed sane; only if defendant found guilty does case proceed to trial on sanity]; 2962, subd. (a) [mental health treatment given to MDO's as condition of parole]; Welf. & Inst. Code, § 6600, sub. (a) [SVP defined as "person who has been convicted of sexually violent offense"]; see *McKee*, *supra*, 47 Cal.4th 1209, fn. 11 [NGI's, SVP's and MDO's more closely resemble each other than LPS conservatees due to the determination that they have committed crimes].) The public guardian reasons that because these three groups share qualities that LPS conservatees do not, the latter group is not similarly situated with the others and equal protection principles are not offended, in compelling prospective LPS conservatees to testify.

It is an "incontrovertible point" that NGI's, SVP's and MDO's do not share identical characteristics with LPS conservatees, who have not necessarily been convicted of a crime or found to be dangerous. (*McKee*, *supra*, 47 Cal.4th at p. 1203.) Because of these differences, it is permissible to treat persons subject to other types of commitments differently from LPS conservatees in some respects. (See *In re Smith* (2008) 42 Cal.4th 1251, 1267–1268 [because SVP's currently in prison, they may be committed based on finding of mental disorder that makes them likely to engage in sexually violent criminal behavior, even though those not in prison can be subject to a

12

long-term civil commitment under the LPS Act only if gravely disabled];
*People v. Cooley* (2002) 29 Cal.4th 228, 252–254 [LPS conservatee and SVP's
not similarly situated for purposes of probable cause hearing].)  But this is
not dispositive in determining whether the groups are similarly situated *for
purposes of the testimonial privilege.*  Case law has recognized that
criminality and dangerousness may be the basis for adopting different types
of civil commitments, but it has also recognized "consideration of prior
criminal conduct as a basis for distinguishing among dangerous persons must
be reasonable." (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 173,
fn. 10 [upholding law enacting Murphy conservatorship, which must be
construed to include requirement that by reason of mental disease, defect or
disorder, person represents a substantial danger to others, against argument
that statute denies equal protection because incompetence to stand trial
bears no rational relationship to "grave disability" as term was then defined
under LPS Act].)  It is not a reasonable distinction to say that individuals
who have not engaged in criminal conduct can be required to testify against
themselves in a trial to determine whether they might be committed against
their will when a person whose commitment is linked to his criminal conduct
can elect to remain silent.  At least, the nature of the commitment requires a
finding that the groups are similarly situated for purposes of requiring the
state to justify this disparate treatment.

The primary benefit of allowing compelled testimony in a case involving
involuntary commitments is that it produces a more accurate verdict by
allowing the trier of fact to observe firsthand the demeanor of the person the
state seeks to commit.  (See *Hudec, supra*, 60 Cal,4th a p. 830; *Cramer,
supra*, 23 Cal.3d at p. 139.)  This interest in an accurate verdict exists in all
involuntary commitment schemes—indeed, it might be argued that the

13

interest is even greater when the mental illness results in the person being a danger to others.

We emphasize that the constitutional right with which we are concerned is equal protection, not the right against compelled testimony. We in no way suggest that the constitution would preclude an LPS conservatee from taking the stand under protest. But the state has determined to extend the privilege against self-incrimination to persons subject to an NGI extension proceeding, and SVP's and MDO's have been deemed by the courts to be similarly situated. "MDO, NGI, and LPS proceedings have the same underlying goal—protecting the public and treating severely mentally ill persons. [Citations.] In the LPS context, ' "[t]he destruction of an individual's personal freedoms effected by civil commitment is scarcely less total than that effected by confinement in a penitentiary." ' [Citation.] '[T]he gravely disabled person for whom a conservatorship has been established faces the loss of many other liberties in addition to the loss of his or her freedom from physical restraint.' [Citation.] 'Indeed, a conservatee may be subjected to greater control of his or her life than one convicted of a crime.' " (*Conservatorship of Heather W.* (2016) 245 Cal.App.4th 378, 383; see also *Conservatorship of Kevin A.* (2015) 240 Cal.App.4th 1241, 1249–1250 [right to jury trial must be personally waived by prospective LPS conservatee unless he or she is incompetent to waive right].)

Another division of this court recently rejected the argument that LPS conservatees are similarly situated to NGI's for purposes of the testimonial privilege. (*Bryan S.*, *supra*, 42 Cal.App.5th at p. 195.) The court acknowledged that LPS conservatees, like NGI's, SVP's and MDO's, "are subject to involuntary civil commitment as a result of their mental health." (*Id*. at p. 196.) But it concluded that LPS conservatees were different from

NGI's, SVP's and MDO's because they need not have been found guilty of a crime or be a danger to others to be committed. (*Ibid*.) This distinction was fatal to the claim that LPS conservatees are similarly situated. "As our Supreme Court has explained, there is 'no similarity between the aims and objectives of the [LPS Act] and those of the criminal law. . . . "The commitment is not initiated in response, or necessarily related, to any criminal acts." ' [Citations.] Again, the purpose of civil commitments for NGI's, SVP's, and MDO's is to protect the public from people who have been found to be dangerous to others and who need treatment for a mental disorder. [Citation.] By contrast, the primary purposes of the LPS Act are to provide prompt evaluation and treatment of persons with mental health disorders; to provide such people with individualized treatment, supervision, and placement services; and to encourage the use of all resources to accomplish these objectives. [Citations.] 'We cannot overemphasize the importance of recognizing that a prospective conservatee is not a criminal defendant but, in many cases, a person in dire need of the state's assistance." ' " (*Id*. at p. 197.)

While NGI's, SVP's and MDO's may have been found guilty of a crime, the purpose underlying those civil commitment schemes is not punishment, but treatment for a mental health condition. (*People v. Endsley* (2018) 28 Cal.App.5th 93, 100–101 [NGI commitment is for purposes of treatment, not punishment]; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1177–1179 [SVP Act does not impose "punishment"]; *People v. Superior Court (Myers)* (1996) 50 Cal.App.4th 826, 839 [MDO law "not punishment"].) LPS conservatees may have a different criminal history than NGI's, MDO's, and SVP's, but at root, like those groups, they are committed against their will for mental health treatment—possibly for the rest of their lives. As counsel for

15

appellant aptly put it at oral argument, before they are asked to be "agents of their own incarceration," the state should be required to justify its decision to treat LPS conservatees differently with respect to compelled testimony.

Turning to the second prong of the equal protection analysis, the public guardian made no showing that appellant's compelled testimony was any more necessary in the proceeding to declare appellant an LPS conservatee than it would have been in other types of civil commitment proceedings. We do not suggest the public guardian could not make such a showing, only that such a showing has not been made as of yet. (See *McKee*, *supra*, 47 Cal.4th at p. 1207; *Curlee*, *supra*, 237 Cal.App.4th at pp. 721–722.) The concurring opinion's thoughtful discussion of the differences between the LPS Act and other civil commitment schemes raises points which are certainly relevant to whether the state has justified its disparate treatment of LPS conservatees.

B. *Harmless Error*

In determining whether the case should be remanded to ascertain whether the disparate treatment of LPS conservatees is justified, we must also address the issue of prejudice. (*Curlee*, *supra*, 237 Cal.App.4th at pp. 722–723.) The public guardian contends that even if appellant should not have been compelled to testify, the error was harmless. This argument requires us to determine which standard of prejudice applies—the harmless-beyond-a-reasonable doubt standard applicable to federal constitutional errors under *Chapman v. California* (1967) 386 U.S. 18, 24, or the less-stringent miscarriage-of-justice/reasonable-probability-of-a-different-result standard applicable to state law errors under *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Blackburn* (2015) 61 Cal.4th 1113, 1132; *People v. Aranda* (2012) 55 Cal.4th 342, 354.)

16

As the public guardian notes, in *Conservatorship of Walker* (1987) 196 Cal.App.3d 1082, 1094 (*Walker*), the court stated that the standard of harmless error in conservatorship proceedings was the harmless-beyond-a-reasonable-doubt standard of *Chapman*. (See also *Conservatorship of Early* (1983) 35 Cal.3d 244, 255.) *Walker* involved an erroneous instruction regarding the elements necessary to impose a conservatorship (*Walker* at p. 1092), and in our view should not be read for the broad proposition that all errors in conservatorship proceedings should be measured under this standard. After all, the *Watson* standard applies to errors of state law in criminal trials; we do not believe an LPS conservatee is entitled to a higher standard of prejudice than a criminal defendant for a comparable error. Additionally, an NGI who challenged the admission of compelled testimony under *Hudec*, which involved a statutory right against compelled testimony, would presumably have the error evaluated under the *Watson* standard; we do not believe a higher standard should be used to evaluate an equal protection claim predicated on the same statutory right. (See *People v. Epps* (2001) 25 Cal.4th 19, 29 [denial of defendant's statutory right to jury trial on prior conviction reviewed under *Watson* standard]; *People v. Barrett* (2012) 54 Cal.4th 1081, 1150–1151 (Liu, J., concurring and dissenting) [*Watson* standard applies to federal equal protection claim based on denial of state statutory right].)

But even under the more demanding *Chapman* standard, the error was harmless. Appellant's own testimony was not essential for the public guardian to prove its case (cf. *People v. Haynie* (2004) 116 Cal.App.4th 1224, 1230), because it had two other witnesses who were familiar with appellant and painted a vivid picture of someone who was unable to care for himself left to his own devices due to his mental illness. Dr. Levin evaluated appellant

17

on behalf of the public guardian and assessed appellant as suffering from a grave disability based on his review of the medical records, his interactions with appellant, and his discussions with appellant's treating psychiatrist. James Grey was a deputy conservator who had been assigned to appellant's case since 2017 and had contact with appellant since 2016. Even if the jurors had not observed appellant's demeanor on the stand, they would have known that appellant was diagnosed as a schizophrenic; that he was on three medications for his mental illness, one of which required careful and regular white blood cell count monitoring; that he had been recently hospitalized for his mental illness; that when living on his own he had engaged in behavior that was not merely aberrant, but put his housing situation at risk; that he was reluctant to participate in treatment and sometimes missed appointments when he was living on his own; that he had limited insight into his mental health condition; and that he did not consistently take his medication or fully comply with his treatment unless required to do so. (See *Walker*, *supra*, 196 Cal.App.3d at 1094 [instructional error harmless beyond a reasonable doubt when "as a matter of law no jury could find [LPS conservatee], on his own or with family help, capable of meeting his basic needs for food, clothing or shelter"].)

## III. DISPOSITION

The judgment is affirmed.

18

_____
NEEDHAM, J.


I concur.


_____
SIMONS, Acting P. J.


*Public Guardian of Contra Costa County v. E.B.* / A157280

Burns, J., Concurring.

I agree with my colleagues' conclusions on prejudice and concur in the disposition. As to the equal protection issue, I agree with my colleagues' conclusion that the public guardian has not justified the Legislature's decision to grant a testimonial privilege in some civil commitment schemes but withhold it in actions under the Lanterman-Petris-Short (LPS) Act.  I write separately to highlight relevant differences between the groups but ultimately conclude that proposed LPS conservatees are similarly situated for equal protection purposes.

## A.

California has no fewer than nine involuntary civil commitment schemes.  (*People v. Barrett* (2012) 54 Cal.4th 1081, 1093 (*Barrett*).)  Most of them apply to persons accused or convicted of a crime, including persons found not guilty by reason of insanity (NGIs; Pen. Code, § 1026, subd. (a)); prisoners whose parole is conditioned on mental health treatment (called mentally disordered offenders or MDOs; see *id.*, § 2962, subd. (a)(1)); and sexually violent predators (SVPs; Welf. & Inst. Code, § 6600 et seq.) [1] (*Barrett, supra,* 54 Cal.4th at pp. 1093-1094.)

Two commitment schemes apply to people who need not have any connection to the criminal justice system; one of those is the LPS Act (§ 5000 et seq.). (*Barrett*, *supra*, 54 Cal.4th at p. 1118 (conc. & dis. opn. of Liu, J.).) The LPS Act serves the state's interest, as *parens patrie*, in caring for citizens who are unable to care for themselves.  (*In re Qawi* (2004) 32 Cal.4th 1, 15.) Enacted in 1967, the LPS Act " 'established the most progressive . . . commitment procedures in the country.' " (*Id.* at p. 17).  It was intended, in part, to "end[] the inappropriate and indefinite commitment of the mentally

---

[1] Undesignated statutory references are to the Welfare and Institutions Code .

1

ill." (§ 5001, subd. (a); *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1009 (*Susan T.*).)

Accordingly, the LPS Act is "designed to ensure that conservatorship proceedings are brought as a last resort, when voluntary treatment has been refused and the temporary involuntary treatment provisions of the act have been exhausted. Each level of treatment decreases the likelihood a conservatorship proceeding will be necessary." (*Susan T., supra*, 8 Cal.4th at pp. 1018-1019.) Involuntary commitments are thus limited to incremental periods of increasingly longer duration—a 72-hour detention for evaluation and treatment (§ 5150, subd. (a)), which may be extended by 14 days if the person is suicidal (§ 5250) and, in some counties, by another 30 days for intensive treatment. (§ 5270.15, subd. (a).) If a jury finds a person to be "gravely disabled" and unwilling to accept voluntary treatment, a court may appoint a conservator for up to one year. (§ 5350.) Gravely disabled means that, as a result of a mental health disorder, the person is unable to provide for food, clothing, or shelter. (§ 5008, subd. (h)(1)(a).) A conservatorship may be avoided entirely if the person can survive with the assistance of friends or family. (§ 5350, subd. (e)(1).)

The majority correctly recognizes the LPS Act may be invoked in several different situations, including when mentally ill persons are found to be dangerous to others. (See §§ 5008, subd. (h)(1)(B), 5150, subd. (a) [72-hour hold for a person who is "a danger to others, or to himself or herself"], 5300 [short-term confinement of dangerous persons], 5350, subd. (a)(2); *People v. Karriker* (2007) 149 Cal.App.4th 763, 775 [discussing Murphy conservatorships, which are intended to protect society from " 'dangerous individuals who are not subject to criminal prosecution' "].) Accordingly, one general purpose of the LPS Act is to protect public safety. (§ 5001, subd. (c).)

2

Under the part of the LPS Act at issue here, however, there is no requirement to show that appellant is dangerous or has been convicted or accused of a crime. Rather, appellant's conservatorship is grounded in a mental health disorder that leaves him unable to care for himself. (§§ 5008, subd. (h)(1)(A), 5350.)

In contrast, the involuntary commitment schemes that apply to persons accused or convicted of crimes are primarily intended to protect society from dangerous people. (See *People v. McKee* (2010) 47 Cal.4th 1172, 1203, 1206-1207 (*McKee*)[commitment of NGIs, SVPs, or MDOs requires proof of danger to others]; *Conservatorship of Bryan S.* (2019) 42 Cal.App.5th 190, 196-197.) After a person found not guilty by reason of insanity has been committed to a state hospital for the maximum term, a prosecutor may extend the commitment if a jury finds the person "represents a substantial danger of physical harm to others" because of a mental disorder. (Pen. Code, § 1026.5, subds. (b)(1), (b)(3).) Similarly, MDOs are violent criminals who have mental disorders that make them a danger to others. (Pen. Code, § 2962.) SVPs are " 'a small but extremely dangerous group of sexually violent predators' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253) with mental disorders that predispose them to commit sexual crimes. (§ 6600, subd. (c).)

### B.

The testimonial privilege at issue here was originally part of a package of criminal procedures that the Legislature imported into sex offender commitment proceedings to address due process concerns. Our Supreme Court likened involuntary commitment proceedings for mentally disordered sex offenders (the predecessor to SVPs) to criminal trials, but without adequate due process safeguards. (*People v. Burnick* (1975) 14 Cal.3d 306,

3

318-324; *People v. Feagley* (1975) 14 Cal.3d 338, 349-352 (*Feagley*).) In response, the Legislature amended the commitment scheme to add safeguards from criminal proceedings. (See *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 821 (*Hudec*); see also, *id.* at p. 827.) In addition to granting criminal discovery procedures, a right to counsel, and a right to jury trial, the Legislature provided: " 'The patient shall be entitled to the rights guaranteed under the Federal and State Constitutions for criminal proceedings.' " (*Id.* at p. 821, quoting Welf. and Inst. Code, former § 6316.2, subd. (e), added by Stats. 1977, ch. 164, § 3, at pp. 634-636, italics omitted.)

Two years later, in the wake of a Supreme Court decision holding that NGIs are similarly situated to mentally disordered sex offenders for confinement duration purposes (*In re Moye* (1978) 22 Cal.3d 457, 467, superseded by statute as stated in *People v. Bennett* (1982) 131 Cal.App.3d 488, 493), the Legislature again borrowed from criminal procedure by enacting similar reforms to the NGI scheme. (*Hudec, supra*, 60 Cal.4th at p. 821.) The reform package included the same provision for "rights guaranteed under the federal and State constitutions for criminal proceedings." (Pen. Code, § 1026.5, subd. (b)(7); *Hudec, supra*, at pp. 821-822, italics omitted.)

In *Hudec*, our Supreme Court held that the plain language of this statute provides NGIs in civil commitment extension hearings the rights "constitutionally enjoyed by criminal defendants," which includes "the right to refuse to testify in the prosecution's case-in-chief." (*Hudec, supra,* 60 Cal.4th at p. 826.) The *Hudec* court conceded a testimonial privilege may arguably undermine the state's interest in an accurate result, but, on the other hand, the Legislature's decision to require the prosecution to " 'shoulder the entire load' " may be viewed as striking a fair balance between the state

4

and the NGI.  (*Id.* at p. 830.)  The Legislature made a policy choice, and, absent a constitutional problem, the courts cannot "reweigh the competing considerations."  (*Ibid.*)

## C.

Equal protection ensures that the government does not treat one group of people unfairly in comparison with other groups with similar characteristics.  (*Barrett, supra*, 54 Cal.4th at p. 1107.)  The initial question is not whether they are similar in all respects but whether they are similarly situated " 'for purposes of the law challenged.' "  (*McKee, supra*, 47 Cal.4th at p. 1202.)

Our Supreme Court has repeatedly stated that the Legislature has latitude to create different rules for civil commitments of people who are dangerous or in prison for criminal conduct.  (See *In re Smith* (2008) 42 Cal.4th 1251, 1266-1268; *Cooley v. Superior Court, supra*, 29 Cal.4th at pp. 253-254; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 171-173 (*Hofferber*.)  "[T]he Legislature may make reasonable distinctions between its civil commitment statutes based on a showing that the persons are not similarly situated, meaning that those who are reasonably determined to represent a greater danger may be treated differently from the general population."  (*Smith, supra*, 42 Cal.4th at p. 1266.)  Two differences between the commitment schemes at issue merit discussion.

First, the testimonial privilege is broadly consistent with the quasi-criminal purpose and process of civil commitments for NGIs, MDOs, and SVPs.  The statutory schemes share a common purpose with criminal law—protecting the public from dangerous people who would otherwise be released from state prisons or hospitals.  (See *Feagley, supra*, 14 Cal.3d at p. 361.)  To achieve that purpose, the Legislature created a civil proceeding modeled in

5

many respects on criminal trials. To ensure due process, the Legislature granted the offender due process rights adapted from criminal proceedings, including a testimonial privilege, along with other features such as criminal discovery rules. (Pen. Code, § 1026.5, subd. (b)(1) and (b)(3); *Hudec, supra,* 60 Cal.4th at pp. 820-822, 827 [noting legislative intent to grant " ' [a]ll rights that apply in criminal trials' "].) Extension of the testimonial privilege is consistent with the criminal model that the Legislature adopted in these commitment schemes. (Evid. Code, § 930 [a criminal defendant has a right to refuse to testify].)

The Legislature structured LPS proceedings differently—less like a criminal trial—to serve different purposes. The government's primary interest is not public safety; there is no accusation that appellant is dangerous. The government is primarily serving its interest as *parens patrie* to care for people who cannot care for themselves. (*In re Qawi, supra,* 32 Cal.4th at p. 15.) The LPS Act is designed to *avoid* commitment wherever possible. (*Susan T., supra,* 8 Cal.4th at pp. 1018-1019; see, e.g., §§ 5350, subd. (e)(1) [a person may not be deemed gravely disabled if friends or family can safely help them]; 5354 [officer conducting conservatorship investigation "shall recommend conservatorship to the court only if no suitable alternatives are available"].) Its goals include protecting the mentally ill *from* criminal victimization (§ 5001, subd. (g)) "and from the myriad forms of suffering endured by those unable to care for themselves." (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 540 (*Ben C.*).) In this context, there is no obvious reason to depart from the general rule in civil cases that no party may refuse to be a witness. (Evid. Code, § 911, subdiv. (a).)

Second, a testimonial privilege serves a similar function in both NGI proceedings and criminal proceedings. The prosecutor is attempting to prove

6

that the person "represents a substantial danger of physical harm to others" (Pen. Code, § 1026.5, subd. (b)(1)), which is effectively an allegation that the person is likely to commit violent crimes. Given the social stigma of branding a person both mentally impaired and a danger to society, it is reasonable for the Legislature to provide a corresponding protection like the testimonial privilege, even when the constitution does not require it. (See *Cramer v. Tyars* (1979) 23 Cal.3d 131, 137-138 [historical purpose of testimonial privilege is to assure that the criminal justice system remains accusatorial]; *Hofferber*, *supra*, 28 Cal.3d at p. 173 [Legislature may determine that dangerous criminals should be "subject to the trauma and stigma of longer-term confinement" unlike other violent persons].) Indeed, the Legislature adopted the testimonial privilege in response to Supreme Court decisions that likened these kinds of commitments to criminal prosecutions. (See *Hudec*, *supra*, 60 Cal.4th at pp. 820-821, 827.)

The need for this sort of counterweight in an LPS proceeding is less obvious. The LPS process is notably different. It begins with a series of short-term efforts to treat and evaluate the patient prior to a potential one-year conservatorship. (*Ben C., supra,* 40 Cal.4th at p. 541.) Rather than a prosecutor, a public guardian (or other designated county official) brings an action for a conservatorship, which may lead to a comprehensive investigation, followed by a report to the court of all available alternatives to conservatorship. (§§ 5351, 5352, 5354.) The LPS Act also includes additional safeguards to minimize the intrusion on a person's liberty that the other groups do not have, including a right to petition for rehearing every six months to establish that the patient is no longer disabled (§ 5364), a right to contest the terms of a commitment and any rights denied the patient (§ 5358.3), and a right to the least intrusive placement option. (§ 5358,

subd. (a)(1)(A).)  The "panoply of safeguards" makes an LPS proceeding "qualitatively different" than a criminal trial by keeping the focus primarily on the conservatee's current needs and progress.  (*Ben C.*, *supra*, 40 Cal.4th at p. 543 [rejecting due process and equal protection arguments for *Anders*/*Wende* review in appeals from LPS proceedings].)  And while I do not doubt the potential stigma associated with being adjudged unable to care for oneself due to mental illness (see *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 228-229), it is surely worse to be adjudged both mentally ill *and* a danger to society.

## D.

Notwithstanding the fact that there are relevant differences between the groups, the public guardian has not demonstrated that they merit treating the groups differently.

A testimonial privilege is a fundamental departure from the normal rules of civil procedure (see Evid. Code, § 911, subd. (a)), and it could be a valuable tool in any case—civil or criminal—where a party deems it advantageous to decline to testify.  The fact that extension of the privilege to NGI proceedings make sense for various reasons, as explained above, is largely due to the Legislature's policy decision to import criminal safeguards into NGI proceedings.  But that does not necessarily mean it is *fair* to grant this valuable privilege to one group and not the other.  Similarly, although NGIs may face *greater* social stigma than LPS conservatees, it is still a problem that they both face.  The differences do not explain why one group should have an advantage that the other does not.  (*McKee*, *supra*, 47 Cal.4th at p. 1203.)  For that reason, despite the presence of relevant differences, the groups are similarly situated for equal protection purposes.  (*Ibid.*)

I agree with the majority that, even if appellant should not have been compelled to testify, he has not demonstrated prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836; ]; *Barrett, supra,* 54 Cal.4th at pp. 1150-1151 (conc. & dis. opn. of Liu, J.).) Thus, we need not remand for the trial court to determine whether differential treatment of proposed LPS conservatees is justified. In future cases, however, the government should be prepared to justify the disparate treatment under the second prong of the equal protection analysis. It may be able to show, for example, that there is a greater need for the proposed conservatee's testimony in LPS proceedings because, in NGI commitment extension proceedings, the government has had more time to observe the person and to gather evidence while he or she has been committed. The record here is insufficient to make that sort of conclusion.

_____
BURNS, J.

A157280

9

A157280 / Public Guardian of Contra Costa County v. E.B.

Trial Court:Superior Court of Contra Costa

Trial Judge:        Honorable Susanne M. Fenstermacher

Counsel:     Sharon L. Anderson, County Counsel, Nina Dong, Deputy County Counsel for Petitioner and Respondent.

By Appointment of the First District Court of Appeal under the First District Appellate Project, Jeremy T. Price and Jonathan Soglin for Defendant and Appellant.