Filed 11/30/22  P. v. Vanhorn CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERIC JOHN VANHORN,<br><br>    Defendant and Appellant. | A164107<br><br>(Lake County Super. Ct. No. CR5401)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the unpublished opinion filed on November 1, 2022, be modified as follows:

On page 9 and continuing onto page 10, the following paragraph is deleted:

In deciding whether to grant a petition for conditional release, the trial court must consider whether the director of the state hospital or other treatment facility advises that the petitioner "would no longer be a danger to the health and safety of others, including themselves . . . while under

1

supervision and treatment in the community, and will benefit from that status" (§ 1603, subd. (a)(1)), and whether the "community program director . . . advises the court that the [petitioner] will benefit from that status, and identifies an appropriate program of supervision and treatment." (*Id.*, subd. (a)(2).) The court must also consider "the circumstances and nature of the criminal offense leading to commitment" and the petitioner's "prior criminal history." (§ 1604, subd. (c).)

On page 10, the paragraph beginning with the sentence "Van Horn cannot satisfy this high burden" and ending with "Each factor weighed against VanHorn" is replaced with the following paragraph:

VanHorn cannot satisfy this high burden. When ruling on the petition, the trial court considered Dr. Morgan's opinion regarding whether VanHorn would be a danger under conditional release; the opinion of the hospital's conditional release liaison that VanHorn was not ready for conditional release because he continued "to experience active psychiatric symptoms including religious and conspiratorial delusional thinking, being internally preoccupied, and presenting with paranoia"; and VanHorn's criminal history and the circumstances and nature of the commitment offenses. These factors weighed against VanHorn.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

Dated: _____                    ____Fujisaki_____, Acting P. J.

2

Filed 11/1/22  P. v. VanHorn CA1/3 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ERIC JOHN VANHORN,<br><br>        Defendant and Appellant. | A164107<br><br>(Lake County Super. Ct.<br>No. CR5401) |

Eric John VanHorn stabbed his brother in the chest.  The trial court found VanHorn not guilty by reason of insanity and committed him to a state hospital with a maximum life term.  Since his commitment, VanHorn has been placed into a conditional outpatient release program (conditional release or conditional release program) several times, but each time he was readmitted to the hospital due to a deterioration in his level of functioning or rules violations.

In 2021, the trial court denied VanHorn's petition for conditional release.  It determined he failed to prove he does not pose "a danger to the health and safety of others, due to mental defect, disease, or disorder, if

1

under supervision and treatment in the community." (Pen. Code, § 1026.2, subd. (e), all statutory references are to this code.) The court did not abuse its discretion in so concluding, and we affirm.

## BACKGROUND

Between 1995 and 2001, VanHorn was arrested eight times for substance abuse-related crimes. He began experiencing auditory hallucinations in his early 20s; he was prescribed antipsychotic medication but did not take it. On a February 2002 evening, VanHorn, then 29 years old, consumed 12 beers and ingested methamphetamine. The following morning — while suffering from a delusion that he was kidnapped as a baby and that his brother was a werewolf — VanHorn stabbed his brother in the chest, puncturing his lung. The prosecution charged VanHorn with attempted first degree murder and assault with a deadly weapon. The trial court found VanHorn not guilty by reason of insanity and committed him to a state hospital with a maximum life term.

VanHorn has spent almost two decades in a state hospital — the exception being time spent in a conditional release program, during which he was supervised and treated in the community. Since 2010, VanHorn has been on conditional release eight times. In seven instances, he was readmitted to the hospital after he "psychiatrically decompensated." In 2020, a three-year period of conditional release was revoked due to his use of alcohol and methamphetamine; once again, he returned to the hospital.

## I.

In June 2021, VanHorn — then 48 years old — petitioned for conditional release. Pursuant to a court order, his psychologist, Camille Morgan, PsyD., prepared a report opining he should not be placed in

a conditional release program because "he would be a danger to the health and safety of others, due to mental defect, disease, or disorder, even while under supervision and treatment in the community."

According to the report, VanHorn suffers from schizophrenia. He has also been diagnosed with moderate amphetamine-type stimulant use disorder and severe alcohol use disorder, both of which are in remission in a controlled environment. VanHorn has an extensive medication regimen, but he has expressed reluctance to take certain prescribed medication. While on medication, VanHorn experiences "delusions which are entrenched and identical to those" underlying the commitment offenses — e.g., "that he was stolen . . . as an infant and that he may be royalty." He has a "psychotic preoccupation with religion and the occult," drawing "symbols on walls and property in an effort to protect himself from 'negative energy.' " In an interview with Dr. Morgan, VanHorn questioned his diagnosis, expressed doubt regarding the need for — and effectiveness of — his medication, and persisted in the delusion that he was kidnapped as an infant.

The report catalogued VanHorn's eight prior conditional releases beginning in 2010, as well as the circumstances resulting in his readmission to the state hospital. In seven instances, VanHorn was readmitted for "psychiatric decompensation."[1] In 2017, he was placed in a conditional release program for the eighth time. In 2019 — and while on conditional release — he abused his antianxiety and antipsychotic medications, and he twice tested positive for methamphetamine. In February 2020, VanHorn submitted a cold urine sample that tested positive for adulteration and

_____

[1] For example, while on conditional release in 2016, VanHorn set fire to cardboard and other materials in a barbeque. VanHorn initially claimed he was cleaning the barbeque, but he later admitted he was conducting a " 'spiritual cleansing.' "

3

methamphetamine. When asked about it, VanHorn initially claimed naiveté. Eventually, however, he admitted trying "to 'cheat' the test by storing clean urine in his refrigerator because he planned to drink alcohol."

According to the report, VanHorn's response — which reflected "antisocial and criminal thinking of trying to 'game the system' or beat the odds" — "places him at risk for destabilization and ultimately dangerous behavior. It also impairs [the program's] ability to successfully supervise him and monitor his functioning in the community, as so much of [the program's] supervision relies on an individual's transparency with the treatment team, not to mention one's practice of sound judgment." VanHorn's meth-amphetamine use, the report concluded, placed him at risk of psychiatric destabilization and increased his risk of violence "substantially beyond that which [the program] can safely monitor in the community." As the report explained, VanHorn's mental state was "extremely fragile," and he had "distortions, religiosity, and bizarre ideation that approach delusional ideation. Historically, he has psychiatrically decompensated quickly and severely in the community under [conditional release]. Engagement in any substance use place[d] him at considerable risk for psychiatric decompensation given the delicacy of his psychiatric stability," which in turn placed him at risk of "dangerous behavior."

Dr. Morgan opined that while VanHorn did not meet the criteria for an involuntary medication order based on dangerousness, he would benefit from the structure provided in the state hospital. The report noted he had "engaged in several rule-breaking incidents and one aggressive act" since March 2020. The most recent incident occurred in January 2021 when he left "the dining room and forcefully and aggressively kicked the . . . doors leading outside of the building."

Dr. Morgan evaluated VanHorn's risk of violence. She noted he continued to exhibit symptoms of schizophrenia, "including paranoid and grandiose delusions which are . . . similar, to those he exhibited around the time of his instant offense," and "psychotic preoccupation with the occult." She also opined VanHorn possessed "poor insight" into "his current psychiatric symptoms, and . . . the nature of his psychiatric diagnosis," as he believed his "symptoms were drug-induced and not due to a chronic psychotic illness." According to Dr. Morgan, he also possessed "incomplete insight into his need for ongoing substance recovery treatment" because he had not meaningfully participated in treatment since his rehospitalization in 2020. Finally, she opined VanHorn might be unable to maintain stability in a "more stressful community environment" because his medication regimen had not been stabilized and he refused to take clozapine, a suggested medication.

Finally, the report noted the hospital's conditional release liaison determined VanHorn was "NOT . . . Ready" for conditional release because he continued "to experience active psychiatric symptoms including religious and conspiratorial delusional thinking, being internally preoccupied, and presenting with paranoia."

## II.

VanHorn testified at the hearing on his petition for conditional release. He acknowledged his schizophrenia diagnosis but believed the stabbing was the result of "drug-induced psychosis." VanHorn has a fixed false belief he was stolen at birth, and he has experienced mania, depression, and psychosis. VanHorn was using drugs and alcohol — and not taking his medication — when he stabbed his brother. He expressed regret for what he had done to his brother.

5

VanHorn has been confined in the state hospital for approximately 20 years, except for a "few times" when he was in a conditional release program. Each time, he was readmitted because he experienced delusions. On his most recent conditional release, VanHorn used methamphetamine and drank alcohol. He was ingesting "caffeine substances" because he craved energy, and he claimed things "got out of hand" — he took methamphetamine and drank alcohol. But VanHorn acknowledged he planned to use methamphetamine; he stored clean urine because he "wanted to be able to continue to stay out in the community after just one usage." VanHorn did not think he did anything "unsafe," but he acknowledged using methamphetamine is illegal and violated the terms of his conditional release. Until he used methamphetamine, he had been sober for 18 years.

Back at the state hospital, VanHorn regained sobriety but did not engage with substance abuse programming. After attending 20 hours of substance abuse programming each week for 20 years, VanHorn felt he had learned everything the hospital had to offer. He decided to take a "vacation" from the programming and do some "inner reflecting" instead, even though he knew his participation was required to attain conditional release. He planned to resume programming eventually. In the meantime, VanHorn planned to use "coping strategies" to stay sober. He participates in group therapy for his mental illness, and he attends weekly sessions with a psychologist.

VanHorn takes his prescribed medication because he needs it to manage his mental illness. He has not had violent or aggressive thoughts since he stabbed his brother — he considers himself a "reserved and quiet" person who tries to be "appropriate and peaceful." At the hospital, he keeps to himself and stays in his room, in part because of a perception that hospital

6

staff "are the police." He decorated his room with drawings of crosses to "keep the holy spirit present in [his] life." VanHorn kicked the dining room doors because he "was hearing" imaginary things, felt threatened, and "was trying to get out of the chow hall." When he is in a "good environment" — one free of "rough talk" and a "prison mentality" — he feels "no need to try to escape."

If released, VanHorn would live with his 80-year-old mother and seek mental health treatment from a county agency. He was willing to take prescribed medication if it did not adversely affect him. VanHorn had a negative response to at least one antipsychotic medication, and he had declined to take clozapine because he feared it would weaken his immune system. VanHorn acknowledged alcohol interferes with his medication, but he hoped that when his "mental illness [was] under control," he could have an alcoholic drink at dinner. He, however, had no immediate plans to consume alcohol and knew it was unlikely he could have just one drink.

At the conclusion of the hearing, the trial court denied the petition. The court found VanHorn failed to establish, "by a preponderance of the evidence, that he is no longer a danger to the health and safety of others if supervised and treated in the community." It acknowledged the only "significant incident of violence" occurred in 2002 but reasoned VanHorn committed the incident while under the influence of drugs and alcohol and while experiencing delusions directed at his family. VanHorn, the court observed, continued to exhibit "active" and "expanded" symptoms of schizophrenia "similar to the ones he was having" when he stabbed his brother. The court opined VanHorn had "poor insight" into his symptoms — illustrated in part by his refusal to take certain prescribed medication — and limited insight into his substance abuse disorder — evidenced by his

7

premeditated decision to use methamphetamine and to discontinue substance abuse programming upon his readmission to the state hospital.

Next, the trial court noted VanHorn had been released into the community — and returned to the state hospital — eight times. This evidence, the court found, supported an inference he did not cope well in a community environment. On the seven occasions when he returned to the hospital after decompensating, he regained stability by "getting back into his programs, back on his regimen, conducting his therapy" and getting his "symptoms into remission." When VanHorn was readmitted in 2020, he did not engage with substance abuse programming. In the court's view, his failure to do so created a risk that, "out in the community facing . . . stressors and anxiety and paranoia-invoking situations that come with dealing with others," he would present a danger to others. The court suggested that if VanHorn "gets back into the programming and active treatment . . . he will again be eligible, in the eyes of the department," for conditional release.

## DISCUSSION

A defendant found not guilty of a crime by reason of insanity may be committed to the Department of State Hospitals. (§ 1026, subd. (a).) "The purpose of commitment following an insanity acquittal . . . is to treat the individual's mental illness and protect him and society from his potential dangerousness." (*Jones v. United States* (1983) 463 U.S. 354, 368.) As relevant here, a defendant found not guilty by reason of insanity may petition the trial court to be released from a state hospital before the expiration of his maximum term of commitment "upon the ground that sanity has been restored," i.e., that he will "not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community." (§ 1026.2, subds. (a), (e); *People v. Cross* (2005)

8

127 Cal.App.4th 63, 72 [listing methods by which a defendant may be released from commitment].)

This process has two steps. At the first step, the trial court holds a hearing at which the petitioner has the burden to prove by a preponderance of the evidence that, as relevant here, he is " 'not dangerous.' " (*People v. McDonough* (2011) 196 Cal.App.4th 1472, 1491.) If the court determines the petitioner will not be a danger to the health and safety of others, he is placed on conditional release, "which may consist of outpatient supervision and treatment . . . . ' "Outpatient status is not a privilege given the [petitioner] to finish out his sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [petitioner] and cause no undue hazard to the community." [Citation.]' [Citation.] While in the outpatient program, the [petitioner] may be returned to the state facility after a hearing if determined dangerous to others." (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1433.)[2]

In deciding whether to grant a petition for conditional release, the trial court must consider whether the director of the state hospital or other treatment facility advises that the petitioner "would no longer be a danger to the health and safety of others, including themselves . . . while under supervision and treatment in the community, and will benefit from that status" (§ 1603, subd. (a)(1)), and whether the "community program director . . . advises the court that the [petitioner] will benefit from that status, and identifies an appropriate program of supervision and treatment."

---

[2] The second step — the restoration of sanity trial — is reached only if the petitioner has been approved for, and successfully completed, "one year of outpatient treatment (or less if the community program director recommends release sooner)." (*People v. Endsley* (2018) 28 Cal.App.5th 93, 101.)

9

(*Id.*, subd. (a)(2).) The court must also consider "the circumstances and nature of the criminal offense leading to commitment" and the petitioner's "prior criminal history." (§ 1604, subd. (c).)

We review the trial court's ruling on a petition for conditional release for abuse of discretion. That phrase " 'implies the absence of arbitrary determination, capricious disposition, or whimsical thinking. [Citation.] "When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge. [Citations.]" [Citation.] Discretion is abused only if the court exceeds all bounds of reason[], all of the circumstances being considered.' " (*People v. Diggs* (2022) 80 Cal.App.5th 702, 709.) To establish an abuse of discretion, VanHorn must show the evidence compelled a finding in his favor as a matter of law, i.e., that his "evidence was uncontradicted and unimpeached and of such character and weight that there is no room for a trial court determination that it was insufficient to support a finding in [his] favor." (*In re D.C.* (2021) 60 Cal.App.5th 915, 921 [reviewing "failure of proof finding"].)

VanHorn cannot satisfy this high burden. As described above, the trial court was obligated to consider three factors when ruling on the petition: the hospital director's opinion regarding whether VanHorn would no longer be a danger under outpatient treatment; the program director's opinion on whether there is an appropriate outpatient program for him and whether he would benefit from outpatient status; and VanHorn's criminal history and the circumstances and nature of the commitment offenses. (§§ 1603, 1604.) Each factor weighed against VanHorn.

10

The trial court also found the circumstances prompting VanHorn's most recent state hospital readmission — his calculated use of alcohol and methamphetamine and his dishonesty following his apprehension — along with his lack of insight into the symptoms of his mental illness and his alcohol and substance abuse disorders, weighed against conditional release. (*People v. Bartsch* (2008) 167 Cal.App.4th 896, 900, 903.) "[P]ractical issues [such] as the amount of stress" VanHorn might face in the community (and whether he would be able to manage that stress) also supported the court's finding that VanHorn had failed to show he was no longer dangerous. (*People v. Sword* (1994) 29 Cal.App.4th 614, 630.) It is undisputed VanHorn's substance use and delusions triggered the commitment offenses, that his current mental state is extremely fragile and he continues to suffer from delusions, and that methamphetamine and alcohol have the potential to intensify those delusions. On this record, we cannot say the court abused its discretion by concluding VanHorn failed to demonstrate his suitability for conditional release.

VanHorn's principal contention is the evidence supporting the trial court's dangerousness finding is speculative because he has not engaged in "dangerous behavior" since his commitment. To support this argument, he relies on several cases, including *People v. Cheatham* (2022) 82 Cal.App.5th 782 (*Cheatham*). There, the prosecution moved to extend the defendant's commitment under section 1026.5, which requires the prosecution to prove beyond a reasonable doubt the defendant both " 'represents a *substantial danger of physical harm* to others' " by reason of a mental disease, defect, or disorder and " 'has serious difficulty controlling his . . . potentially dangerous behavior.' " (*Cheatham*, at p. 789, italics added.) At trial, the prosecution offered expert testimony that the defendant experienced symptoms related to

11

his diagnosed schizoaffective disorder, that he might self-medicate if released, and that if he used drugs, "it would likely increase his mental health symptoms, decrease his control, and decrease his compliance with taking medications." (*Id.* at p. 787.) Another expert opined that if the defendant stopped taking his medications and resumed using drugs and alcohol, " 'he would become more dangerous' as he could become delusional and think others meant him harm." (*Id.* at pp. 787–788.) But there was no evidence the defendant engaged in dangerous behavior nor any evidence he "*might* engage in this type of behavior." (*Id.* at p. 786.)

*Cheatham* reversed the commitment extension order. It accepted the premise that the defendant "*could* relapse into drug and alcohol use if released, which *could* then increase his mental health symptoms," but reasoned "this speculative outcome [was] insufficient in itself to support continued commitment due to substantial risk of danger." (*Cheatham*, *supra*, 82 Cal.App.5th at p. 793.) The court noted the defendant had experienced periods when he "used drugs and periods when his mental health symptoms were 'pretty bad' and yet the record includes not one instance in which [the defendant] evidenced any propensity to engage in dangerous or threatening behavior toward others because of his mental disorder." (*Ibid.*) *Cheatham* acknowledged a "person's potential for relapse and the consequences of such are, of course, meaningful considerations" but cautioned, "we cannot assume that people without a record of dangerous behavior will struggle to control dangerous behavior simply because they have, or are likely to have, active mental health symptoms—whether triggered by drug use, alcohol use, or something else." (*Id.* at pp. 793–794.)

We have no quarrel with the holding in *Cheatham* — that to satisfy its burden of proof on a petition to extend a defendant's commitment, the

prosecution must provide an evidentiary nexus between the defendant's mental illness and his dangerousness, and speculation about what might happen if the defendant uses drugs or decompensates is insufficient, by itself, to support continued commitment under section 1026.5. But *Cheatham* does not compel reversal. There, the prosecution had the burden to prove beyond a reasonable doubt the defendant poses a *substantial* danger of *physical harm* to others and that the defendant has serious difficulty controlling his potentially dangerous behavior. (§ 1026.5, subd. (b)(1).) Here, it was VanHorn's burden to prove he will not be a danger to the health and safety of others (§ 1026.2, subd. (e)), a standard that does not require a threat of physical harm. (*People v. Woodson* (1983) 140 Cal.App.3d 1, 4.) Thus, at the hearing on his petition for conditional release, VanHorn was presumed to be suffering from a mental illness that rendered him a danger to society if released, and it was his burden to prove otherwise. (*People v. Sword*, *supra*, 29 Cal.App.4th at p. 624; *People v. Nance* (2022) 78 Cal.App.5th 784, 787.) *Cheatham* is also factually distinguishable. Unlike *Cheatham*, where the defendant had never engaged in dangerous behavior, VanHorn's commitment offenses were violent *and* dangerous, and there was evidence he had recently committed an aggressive act — forcefully kicking the hospital's dining room doors — attributable to his mental disorder. (*Cheatham*, *supra*, 82 Cal.App.5th at p. 790.)

VanHorn's reliance on two other cases — *People v. Johnson* (2020) 55 Cal.App.5th 96 and *People v. Redus* (2020) 54 Cal.App.5th 998 — is likewise unavailing. *Johnson* reversed a commitment extension order where the record was devoid of evidence suggesting the 69-year-old mentally disordered offender's decompensation in an unsupervised setting would lead to violence, particularly in light of the fact that he had spent 11 years in the

13

community and had stopped taking his medication for periods of time with no violent repercussions. (*Johnson*, at pp. 108–109.) Additionally, some of the defendant's delusions "had 'gone away'" and there was no "evidence of recent violence or aggression." (*Id.* at pp. 99, 101, 110.) In *Redus*, the appellate court concluded the prosecution failed to "provide the required link" between the defendant's "mental illness and his purported difficulty in controlling his potentially dangerous behavior." (*Redus*, at p. 1013.) *Redus* noted there had "not been a hint of violence, threatening behavior, or aggressiveness of any kind" by the 73-year-old defendant — a "'fragile old man'" — for more than four decades, "even through [conditional] releases and medication lapses." (*Id.* at pp. 1011, 1012.) Here and in contrast to these cases, VanHorn continued to experience delusions, and he had recently engaged in aggressive conduct in response to those delusions.

VanHorn's other arguments do not convince us the trial court abused its discretion. For example, VanHorn maintains the offenses leading to his commitment are dissimilar from his relapse in 2020, and he suggests there is a plausible justification for his preoccupation with his family tree. He also insists his act of kicking the dining room doors does not evince an intent to harm others. This strategy is not persuasive. As discussed above, we are not permitted to reweigh the evidence. Given Dr. Morgan's report, which the trial court credited, we cannot conclude it was an abuse of discretion for the court to infer VanHorn had the potential to react dangerously if placed on conditional release. Nor are we persuaded by VanHorn's suggestion that the prosecutor must demonstrate he is unable to control his behavior. Assuming a defendant's inability to control his behavior — a consideration under section 1026.5 — is relevant when evaluating dangerousness under section 1026.2, the burden is on the petitioner, not the prosecution.

In sum, we conclude the trial court did not abuse its discretion in denying VanHorn's petition for conditional release.

We offer two closing observations. First, the question before us is not whether we might have ruled differently. Rather, we decide only whether the trial court abused its discretion in denying the petition. The answer is no. Second, we observe that over the last two decades of his commitment, VanHorn has made progress managing his mental illness and substance use disorders; in the future — as the court observed — he may well demonstrate his suitability for conditional release. (See *People v. Endsley*, *supra*, 28 Cal.App.5th at pp. 106–107 [a defendant seeking conditional release is entitled to the appointment of an independent expert to assist in demonstrating readiness for outpatient treatment].)

## DISPOSITION

The September 2021 order denying VanHorn's petition for conditional release is affirmed.

_____

Rodríguez, J.

WE CONCUR:


_____

Fujisaki, Acting P. J.


_____

Petrou, J.


A164107

16